HATTIE FARROW, Appellee, v. WHAT CHEER CLAY PRODUCTS COMPANY et al., Appellants.

**EVIDENCE: Res Gestae—Admissibility.** Statements by an injured
1  party relative to his injury, manifestly made very soon after the injury, and while he was excited, and suffering pain, are properly receivable as *res gestae.*

**MASTER AND SERVANT:** Workmen's Compensation Act—Injury
2  Accelerating Pre-existing Fatal Disease. Principle reaffirmed that the right to compensation may exist although there was pre-existing heart disease, if the disease was aggravated and accelerated by an accidental injury.

*Appeal from Keokuk District Court.*—D. W. HAMILTON, Judge.

November 11, 1924.

This is a workmen's compensation case. Compensation was awarded to the widow by the committee and, on review, by the commissioner. The district court affirmed the award. Defendants appeal.—*Affirmed.*

*Miller, Kelly, Shuttleworth & McManus* and *H. W. Raymond,* for appellants.

*F. M. Beatty,* for appellee.

Preston, J.—Appellee contends that deceased was injured Monday morning, December 20, 1920, while in the course of his employment. He died Saturday, December 25th. Appellee says that the injury was the cause of his death, or at least that the death was accelerated by the injury. No one saw the accident. The fact of the injury may be shown circumstantially. Appellee sought to show this by declarations by deceased, and by complaints and other circumstances. It was contended by appellants that all such statements were hearsay, properly objected to, and that there is no legal evidence to establish the fact; while appellee contends that the statements were such as that they were part of the *res gestae,* and that the evidence taken as a whole is sufficient to establish her claim,—or at least, to make a conflict so that the finding of the committee and commissioner may not be questioned by the court.

1. Appellants state, substantially, that the big question in the case is whether or not death resulted from an accident. We do not understand appellants to question appellee's claim that the accident and injury, if such there were, arose out of and in the course of the employment. It is necessary to set out the evidence to some extent. This we shall do as briefly as may be, stating the substance of it. Some fifteen or sixteen witnesses were used for plaintiff, and five or six for the defendants.

It is plaintiff's claim that deceased was injured by falling from a platform; that he fell to the floor, six or eight feet below, striking the part of his body near the heart upon a block of wood

which was lying on the pine floor. It was a part of the duty of deceased to oil the machinery, both on the platform and below, before starting his regular work, which was feeding a clay press, which he did by operating levers. The station at which he worked was on the third floor of the building, and on a platform six or eight feet above the third floor. The platform was about three feet wide; though one witness refers to it as a plank. An ordinary ladder about eight feet long was the only means of getting up and down to and from the platform. The platform was a temporary one, placed upon scaffolding. There were a few blocks of wood on the floor which the carpenters had left. They were making repairs at the time. The ladder was not fastened.

Plaintiff says that, when her husband left home that morning, he was in his usual health; that, when he returned that evening, she noticed that there was something wrong; that he could not stoop down; that he complained of having been hurt, and of pain; that he was holding his side; that he was very careful of his movements, and uneasy; that she saw that his side was discolored, with streaks of red; that she put bandages over his side, where it was hurt; that he continued to hold his side and complain of pain from that time until the last time she saw him alive, Saturday morning; that the bandages she put on were not removed until after death.

Another employee, Edmundson, whose work was on the fourth floor, says that, in going to his work, he had to pass the station where deceased was employed. On this Monday morning, witness had just been to the storeroom for a can of oil, and was going up the stairs. It was just at the time he was going to work, and he passed Farrow's station on the way to his own. He was attracted by Farrow's condition; spoke to Farrow, and stopped, because he noticed him leaning against the conveyor. When he first saw deceased, he (deceased) was leaning against the conveyor, holding his hand on his left side, over the region of his heart. His expression showed that he was suffering pain, and was in distress. At this time, Farrow told witness that he went to pull a lever to set the machinery going, and he fell and hit himself on a stick of wood. Deceased said: "I got up to the

top, and was just stepping over on the platform, and I did not get very far,—the ladder slipped;'' that he could not catch him-self, and fell. He showed witness a block of wood, and said, ''I fell on that, and it hurt me.'' Deceased opened his shirt and showed witness a mark where he was hurt. This mark was over the region of the heart, in the place where he had been holding his hand. There was an abrasion there, and it looked fresh, as if just hurt. Deceased worked the rest of the day, but stayed at home the following day, and came back to the plant Wednesday; complained that his side hurt him; said he was about done for, and that he ought not to have come to the plant. Deceased did not return to the plant or to work after Wednesday. Saturday afternoon, while sitting in front of the store down town, he suddenly collapsed, and died from heart failure. There was no post-mortem.

Another witness testifies that, the morning of the accident, he was informed by some of the men that deceased had had a fall. Witness went to Farrow's station. Farrow appeared ex-cited and fidgety. Deceased told witness he had slipped and fallen; that his foot slipped, and pushed the ladder out, and he fell; that he ''fell on that stick of wood,'' which witness thinks was a 2x4 or a 4x4. Witness says there were some 6x6's or 8x8's lying on the floor. Witness says that deceased was excited a little when he went up to him.

Other witnesses testify to complaints made by deceased of his condition at different times, as they observed him, between Monday and Saturday. One says that, when Farrow went to move, he held his side, and appeared to be suffering pain; that he complained that his side hurt him; that his condition was worse on Friday than on the former day when she was there. Another witness says he appeared to be worn out with pain; that he was sitting in a chair, and it seemed almost too much for him to talk; that he said he did not think he would get over it. Another witness says that, on Thursday evening, deceased appeared to be restless and in much distress; that he would move from chair to chair, and hold his left side and wince, as though suffering pain. Another witness observed him holding his hand over his left side over the region of his heart. This witness says that he

did not seem able to rest well anywhere; that he was restless all the time; that his face showed that he was suffering pain. Another says he brought deceased home from the plant, Wednesday evening; that he came out of the plant with his hand over his side, "kind of stooping over;" that he asked witness to drive slowly, for the reason that the jar of the car hurt his side. Another witness saw deceased sitting in front of Mitchell's store Saturday. He was leaning with his hand on his left side, and said he was dying. Witness got-help, and a doctor, but Farrow died in a short time. Witnesses describe the condition of the body and appearance after death. One noticed a very dark place right over the heart region,—purplish colored. Witness says that parts of the body adjoining were not this color; that the discolored place was about six inches across. Another witness saw the bandages removed, and says that there was a dark blue spot around the region of the heart. Another witness noticed the discoloration,—more of a square form than circular. The undertaker, of twenty-two years' experience, described the discoloration, and said that this condition could only be produced when an injury had been received before death; that the embalming fluid would tend to bring out more plainly the place of the injury where the vessels of circulation had been broken; that, where the injury was deep-seated, the fluid would have a tendency to bring it out more plainly; that he knows of no other way this discoloration could be present there, unless there had been an injury in that region before death.

We think the statements of deceased made to Edmundson were a part of the *res gestae*. True, the length of time which elapsed was not definitely given, but it must have been very soon after the fall. It was at the very place of 1. EVIDENCE: *res gestae*: admissibility. the accident, and when deceased was nervous, excited, and suffering pain. The declarations were so near in point of time to the principal transaction as to clearly appear to be spontaneous, unpremeditated, and free from sinister motives. The rule as stated is the rule of the cases cited by appellant. As said in some of the cases so cited, it is not so much a question of what the rule is, but the application of the rule to the facts in a particular case. *Keyes v. City of Cedar*

*Falls,* 107 Iowa 509, 517, is somewhat similar, in the facts, to the instant case. See, also, as sustaining our conclusion, *Peterson v. Phillips Coal Co.,* 175 Iowa 223, 228; *Hinnah v. Seaba,* 193 Iowa 1206, 1218; *Vernon v. Iowa St. Trav. Men's Assn.,* 158 Iowa 597, 600; *Stukas v. Warfield-Pratt-Howell Co.,* 188 Iowa 878, 888.

2.   An award of compensation may be made although there was pre-existing heart disease, if the disease was aggravated and accelerated by an accidental injury. *Hanson v. Dickinson,* 188 Iowa 728; 19 A. L. R. 96, note; 20 A. L. R. 4, note. We do not understand appellants to dispute the legal proposition. In this case, it is a question of fact. Appellants contend that the death was the result of heart disease, or aortic stenosis, alone; and that the accident had nothing to do with it. The claim is that the evidence is undisputed. In this we cannot concur. It is necessary to set out some further evidence bearing on this question. There is evidence tending to show that deceased was 64 years of age, 5 feet 7 or 8 inches tall, well proportioned, with square shoulders and ordinary flesh. A number of witnesses testify to their acquaintance with him of from 25 to 30 years, and that he always seemed to be a man of good health. Witnesses had never noticed any marked change in his condition from year to year, and no marked difference in his weight. He had worked for the defendant for about five years, and commanded top wages. He was a steady worker. He had been employed in the work of feeding the press for a few months. Prior to that, he was engaged in the clay pit, where he loaded and scooped the mined clay into the car. He had also been employed in the clay shed, where his work consisted of shoveling clay into wheelbarrows and wheeling it to the conveyor. Prior to that, he had been a coal miner most of his life, engaged in the actual digging of coal. His wife testifies that he had miner's asthma, but that she had never noticed any signs of shortness of breath, except when he was working underneath, in the coal mines. Other witnesses give similar testimony, and say that they had never known of his being sick; that he looked healthy and robust; that he did heavy work. It may be conceded that de-

2. MASTER AND
SERVANT: Work-
men's Compen-
sation Act: in-
jury accelerating
pre-existing fatal
disease.

ceased had heart trouble, as claimed, and that this had existed for some years.

Dr. Rayner, testifying for defendant, says substantially that he examined deceased in August, 1918.

"Discovered that he had valvular heart trouble,—aortic stenosis. May have examined him before that, but could find no record of it. He came to my office several years ago,—a good many years ago,—about some stomach trouble, and I discovered heart trouble at that time. The aortic stenosis was just the same each time; noticed no change. His heart was always regular; it was compensating; the pulse was all right. I never treated him especially for heart trouble; treated him a little for the flu. At that time, I examined his heart, as a matter of precaution. His heart was compensating as it always had done, just the same. The condition of aortic stenosis in no way interfered with the regularity of the heart. It would not be expected that a man who had done hard physical work for years, and had this trouble for years, and went on doing heavy manual labor, that he would die of heart trouble when he was doing light work or no work. That would be very unusual. It is the irregular heart that causes sudden death. I believe such a fall would make a regular heart turn to one that was irregular. It would be more likely to injure a man that had aortic stenosis than a man who was perfectly strong and sound. Stenosis is a condition where there is lack of tone to the valve of the heart; where the valves fail to close with each contraction. That condition is sometimes followed by what is known as angina pectoris, and in that, there is a great possibility of it ending in death."

Another doctor testifies:

"Aorta stenosis, as generally understood, is a contraction of the aorta and the warping of the aortic valves by adhesions from previous inflammation. It is an inflammatory process that affects the aorta, and lesions of that kind are the result. An examination often shows that the inflammatory process extends high up into the aorta. The walls of the aorta and the edge of the valves are attacked by bacteria, causing inflammation and roughening of the walls and a shriveling or contract-

ing, and on the edge of the valves on the walls where this in-flammation has been set up, there forms a lime deposit, which is frequently broken from the edges of the valves as the out-rush of blood takes place. This condition could exist with aorta stenosis. It is quite possible for people having aorta stenosis to die from some other disease altogether. As long as the heart compensates and is regular, you would not expect sudden death from aorta stenosis. The thing that might cause sudden death is breaking off of deposits of lime or fibrin and its injection into the coronary arteries. As to what would cause them to break off, we presume that takes place when the blood goes back and forth with the impulse of the heart when it is forced out in a jet or wave and when it reacts back, those things can be broken off. It is very natural to expect that this is more apt to happen in exertion than in a quiet condition. In a party who has stenosis, the heart must compensate. This comes about by an increase in the muscles of the heart. The man you describe, and doing the work which deceased did, I would say that his heart was compensating all right. Falling on a block of wood and striking in the region of the heart might affect the heart in two ways: there would be a certain shock to this region; stops the action of the heart for a moment, and that causes a clogging of the larger vessels with blood. When the heart again resumes action, it will put a strain upon the heart. If a man had a disease of that kind, a shock over the heart would be more likely to injure him. We do not have a sudden death from aorta stenosis where there is compensation of the heart. That is unusual. Something must interfere with the nutrition or the nerve control. When a man's heart is compensating, he can perform his ordinary labor. If his heart was not compensating, it would appear on the deceased.''

There was other medical testimony. The doctors seem to agree that, as long as the heart is compensating and regular, you would not expect sudden death. One of them says that a man might have valvular leakage and the heart would go on and be regular for years, and the same is true of one having aortic stenosis, ''as long as the nerve centers of the heart act regular, there would not be any danger;'' that, as long as the

heart compensates and is regular, you would not expect sudden death from stenosis; that, as long as the heart compensates, a man might live, and then die of old age; that you do not generally have a change from a regular to an irregular heart unless you have some strain or violent exercise or violent disease.

This is but a synopsis of the testimony on this subject; but we think it is sufficient to sustain plaintiff's claim, and the finding of the committee and commissioner.

The judgment is—*Affirmed.*

ARTHUR, C. J., and EVANS and FAVILLE, JJ., concur.