DOROTHY A. HENDERSHOT, APPELLEE, V. CITY OF LINCOLN, APPELLANT.

286 N. W. 909

FILED JULY 11, 1939.   No. 30675.

*Clarence G. Miles* and *Frederick H. Wagener*, for appellant.

*Roland M. Anderson, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, MESSMORE and JOHNSEN, JJ., and LANDIS, DISTRICT JUDGE.

PAINE, J.

This is an appeal by the city of Lincoln from a judgment of the district court affirming an award of the compensation court for the death of Warren Hendershot.

The facts disclose that the deceased was a strong, healthy

man, who had scarcely been sick a day since he was operated on for appendicitis about ten years before the accident. He was married in 1923, and had resided at 301 North Forty-fourth street, Lincoln, for 12 years, and was the father of four children, who with his wife, the plaintiff, survive him.

On Saturday, March 30, 1935, he was working at his trade of a bricklayer, as an employee of the city, at Fifteenth and Garfield streets, on Project 7-A, No. 59, which was the construction of an extension of the regular storm sewer system, with arched-over top, being built entirely of brick to use more labor than cement construction would use. This extension of the sewer system was being built for the sole and exclusive use and benefit of the city of Lincoln, and under its direction and control.

In getting bricks down to the bottom of the deep excavation, three men were used to handle them. The first, who was at the street level, picked up two bricks and tossed them down to a second man standing on a plank about three feet below the top of the bank, and he tossed them to the third in the bottom of the excavation.

At about 1:30 o'clock in the afternoon, Hendershot, who was laying bricks in the bottom of the sewer, raised up and the bricks hit him on the back of the head, cutting through his cap and hair, and making a gash in the skin which bled. The foreman, Meredith W. Phillips, testified that there was a little blood on the inside of his cap, and the gash was about one-half inch long. He would have fallen from the force of the blow had not a fellow worker, James Webber, caught him, and foreman Phillips took him out of the ditch and down to the city clinic, and remained with him, and brought him back to work in an hour and a half, and testified that he worked the rest of the day. The work stopped at 4:30 p. m. Webber rode home with him and, while Hendershot drove his own car, he complained of headache, and Webber said "he looked like he didn't feel very well."

Dr. Underwood, the city physician at the clinic, made an examination and dressed the wound, and after about an hour and a half told him he could go home and report back

if he had any complications. He was pale, and immediately laid down on a day-bed, and asked for aspirin, which he had never taken before. His wife applied cold packs to his head. He did not eat much supper, and went back to the day-bed and laid there until about 9 o'clock, when he went to bed. He laid down nearly all the next day, which was Sunday, with cold packs on his head, and was dizzy, and this condition continued for several days. On Monday a man asked him to do some mantel work as a bricklayer. He tried to do the work, but only stayed an hour and a half, and went home to bed. On Tuesday he tried to work again, and gave it up, and returned home, suffering from headache and dizziness. He appeared weak. On Wednesday he tried to work, but gave it up after a while, remained home the rest of the day, and complained of dizziness. On Thursday he got some groceries, but returned home, and headache continued. On Friday he thought he would have to go back to work on the sewer or lose his position. He came home complaining of headache and pain in the head. He went back to work Saturday morning on the sewer job, and while sitting on a pile of sacks, just before 8 o'clock in the morning, he fell forward and collapsed, and was taken by a fellow employee to the city clinic. When he arrived there he was suffering from a severe chill. The doctor then diagnosed his case as lobar pneumonia. He was taken home and never got out of bed, and died of lobar pneumonia on April 13, just two weeks from the day he was injured.

Dr. Arthur L. Smith was called as a medical expert by the plaintiff, and after being duly qualified and describing lobar pneumonia, which he said might be caused by 32 types of organism, he was asked a hypothetical question, embodying all of the pertinent facts relating to Mr. Hendershot's death, the question ending thus: "Are you able to state with reasonable certainty whether or not the accident and injury which Mr. Hendershot sustained on March 30, 1935, when he was hit on the head by these two bricks, was the producing cause of the pneumonia from which he died?" After objections were ruled upon, he stated: "Well, it is my opinion

that the man had a concussion of the brain and which existed during that period of time which you have described and he couldn't work. Therefore, he was weaker than he normally was before and, in a weakened condition, his resistance to the lobar pneumonia organisms was lowered, and the lobar pneumonia was the direct result, therefore, of the injury to his head and the concussion of the brain."

The deceased was not a common laborer, but a skilled bricklayer, and was paid $1 an hour, and was working under Charles Simon, who was foreman of the bricklayers.

It is conclusively shown by the record that the city engineer's office drew the plan and blueprints for the storm sewer, Project 7-A, No. 59; that the project was that of the city, which had made application for the funds. The city had the direction and supervision of the construction work itself. It provided all the supervisors and foremen, who were all paid by the city. The project was a continuation of, and a part of, the storm sewer system of the city of Lincoln. The deceased reported for work to Phillips, the city foreman. He was given a chance to see if he was capable of doing the work. He was satisfactory and was continued on the job. If his work had not been satisfactory, the foreman would have reported him to the timekeeper, and they would have transferred him to some other job. He would have been off this job.

The first assignment of error is that the death of Hendershot from lobar pneumonia was not the result of the injuries sustained by him on March 30, 1935.

Dr. Underwood, who had moved to Colorado, and whose deposition was taken, testified that he treated Hendershot at the clinic on March 30, and he did not come back; then on April 6, when he was brought in, he had lobar pneumonia, and from that time on he treated him until he died April 13. In his opinion, the slight head injury did not show any complications, and had no connection with the man's death.

Dr. Harry Everett was called by plaintiff and subjected to a very spirited cross-examination, but maintained posi-

tively that Hendershot had sufficient injury to his head to lower his resistance to infection, and that his injury was directly followed by lobar pneumonia, which was the immediate cause of death.

In the opinion of the court, the facts bring it within the statute (Comp. St. 1929, sec. 48-152), "violence to the physical structure of the body and such disease or infection as naturally results therefrom," and that his death followed the accident he suffered with reasonable certainty.

The second and last assignment of error charges that the district court erred in finding that Warren Hendershot, at the time of his injury, was an employee of the city of Lincoln, and insists that such finding is not supported by the evidence.

It is impossible to analyze or consider the conflicting decisions of the courts of the various states in relation to the employment situation without a glance at the rapid growth of this problem and the diverse manner in which it has been met in various cities and states.

When the depression began to extend itself year after year, the care of the unemployed, which first rested upon municipalities and counties, was undertaken by the states, and when the burden proved too heavy for the states then the federal government began to gradually get under the burden. Mass unemployment brought many new problems, and the early campaigns of welfare departments of municipalities, with the slogans of "Share the work" and "Give a job," proved entirely inadequate to the steadily increasing needs of the millions out of work.

In August, 1932, the emergency relief and construction act, 47 St. at Large, 709, 15 U. S. C. A. sec. 605a, was passed to provide employment through public works projects. In May, 1933, the Federal Emergency Relief Administration provided greater funds to be given directly to the states, and in November, 1933, the Civil Works Administration was initiated, which terminated March 31, 1934.

On April 1, 1934, the various states took over the administration of federal funds, under a new act of congress, which

act required contributions from the local units sponsoring the various work projects, usually of the material necessary, and this lasted until August 1, 1935, when the federal government again assumed the role of sole employer of relief workers through the creation of the Works Progress Administration. 49 St. at Large, 115, 15 U. S. C. A. sec. 728, note. Thereafter each session of congress has enacted new legislation, but for the purposes of the case at bar we need not consider later legislation by congress.

This brief summary of the federal efforts indicates clearly that Hendershot's injury, which occurred March 30, 1935, came within the period from April 1, 1934, to August 1, 1935, when the state of Nebraska itself was primarily responsible for work relief administration projects, and that the funds were furnished directly to Nebraska by the government, and that this state could make such requirements from local units sponsoring the work projects as it desired.

It will thus be seen that the set-ups between the federal government, the states, and the municipalities varied from year to year, and that in examining decisions from various courts it is helpful to know under which particular phase of the various set-ups the injury occurred. It has been stated by one authority that generally in 14 jurisdictions the relief worker on such projects is compensated in practically the same manner as a worker in private industry. These jurisdictions are given as Arizona, Colorado, Illinois, Maryland, Montana, New Hampshire, New Mexico, Oregon, South'Dakota, Utah, Virginia, District of Columbia, Hawaii, and Porto Rico, and in many other states compensation is granted depending upon the special facts in each case. The statement is also made that compensation has been denied relief workers in the following states: Alabama, California, Florida, Georgia, Iowa, Kansas, Kentucky, Maine, Massachusetts, Missouri, North Carolina, South Carolina, Tennessee, and Texas. In considering the reason for the denial, it is said that it has been done in Massachusetts because the corporation counsel of the city of Boston has ruled that under the Poor Law (Mass. Gen. Laws 1932, ch. 117) the over-

seer of public welfare has a right to their services, and the attorney general took the same position, and the supreme judicial court has affirmed rulings denying compensation. *Commonwealth v. Pouliot,* 292 Mass. 229, 198 N. E. 256. In Georgia all claims have been effectively barred by the opinion of the attorney general. In Iowa compensation is denied on the theory that no contract of employment is created. In one of the late cases, *Hoover v. Independent School District* (1936) 220 Ia. 1364, 264 N. W. 611, denied compensation because the four painters injured had no contract of employment with the school district. It is stated that congress by special act extended to all Civil Works Administration workers all the benefits accruing to injured employees of the federal government, and the claimants are now receiving benefits thereunder.

In at least one state, North Dakota, the relief worker is excluded from the benefit of the compensation law by statutory enactment. N. Dak. Laws 1935, ch. 286. In three of the states denying compensation, Alabama, Missouri, and Tennessee, the compensation coverage is optional with local units, and in Kentucky and Kansas the act is elective.

One of the leading cases denying compensation is the case of *Vaivida v. City of Grand Rapids,* 264 Mich. 204, 249 N. W. 826, 88 A. L. R. 707, being followed by an annotation, which annotation is continued at greater length in 96 A. L. R. 1154. In the *Vaivida* case a man was injured while working in the city park in Grand Rapids. He was given an award for compensation. He was compelled to do the work as a condition to receiving relief from the city, and was paid 40 cents an hour in script. The Michigan court, with five judges supporting the opinion and four dissenting, held that such persons receiving such public aid as relief work were not employees of the municipality so as to be entitled to compensation under the workmen's compensation act.

Another leading case denying compensation is that of *McBurney v. Industrial Accident Commission* (1934) 220 Cal. 124, 30 Pac. (2d) 414. In this case it was held that

the recipient of aid from county welfare department, who was injured while clearing a drainage ditch for the city of Monrovia, was not an employee within the compensation act, as there was no contract of hire, and because he was an indigent person, receiving relief from the county, and therefore in a sense was the county's ward.

Cases cited by the California court in this decision involve the American Red Cross, Boy Scouts of America, Trustees of St. Patrick's Cathedral, and New England Sanatarium and Benevolent Association, while the question before the court involved an employee engaged in industrial work, and not charitable work.

Many decisions of the states refusing compensation do so on the ground that there is no contract of employment with relief workers. Possibly they have overlooked the fact that the definition of a public employee has been more liberally construed than that of a private employee. In *County of Monterey v. Industrial Accident Commission,* 199 Cal. 221, 248 Pac. 912, 47 A. L. R. 359, a bystander, who was summoned by a sheriff to help arrest some bootleggers landing a cargo of intoxicating liquor, was shot through the heart, and recovery was allowed under the workmen's compensation act for his death, on the theory that he was a public employee. A petit juror, being injured while on duty, was held to come within the compensation law. *Industrial Commission v. Rogers,* 122 Ohio St. 134, 171 N. E. 35. And a convict injured when doing road work was held entitled to compensation as a public employee. *California Highway Commission v. Industrial Accident Commission,* 200 Cal. 44, 251 Pac. 808.

Where the taxpayer had the option of paying a road tax or working it out, and chose to do the latter, and was killed, he was held to be a public employee, in *Town of Germantown v. Industrial Commission,* 178 Wis. 642, 190 N. W. 448, 31 A. L. R. 1284, with three judges dissenting. See, also, *City of Winfield v. Peeden,* 8 Kan. App. 671, 57 Pac. 131.

While a relief worker was operating a plow for the city of Ogden, he fractured his leg. It was held that, because

his wages were paid from federal funds, it did not negative his being an employee of the city, which controlled and directed his work. *Weber County-Ogden City Relief Committee v. Industrial Commission,* 93 Utah, 85, 71 Pac. (2d) 177. See, also, *Mayze v. Town of Forest City,* 207 N. Car. 168, 176 S. E. 270 ; *Hattler v. Wayne County,* 117 Pa. Super. Ct. 570, 178 Atl. 513.

In the case of *Forest Preserve District v. Industrial Commission,* 357 Ill. 389, 192 N. E. 342, one sent by relief organization to work for the forest preserve district held entitled to compensation for injuries from the district, even though the district could not fix wages, yet had complete control of his services. In this case the man received a card from the Illinois emergency relief commission, and was sent to the district to work six days a month at $5 a day. He cut his hand on a bottle while loading trash onto a truck; blood-poisoning followed; adhesions, scar tissue, and ankylosis impaired the use of that right hand. The court said: "The case presents a situation similar to that where an employee is injured while working for a second employer to whom he has been loaned temporarily. Under the common law an employee in the general employment of one master may with his consent be loaned to another and become the employee of the master to whom he is loaned. *Allen-Garcia Co. v. Industrial Commission,* 334 Ill. 390, 166 N. E. 78. The existence of the workmen's compensation act does not change this rule and the test remains the same—that is, whether or not the employee becomes wholly subject to the control and direction of the second employer, and freed, during the temporary period, from the control of his original master. Under this rule it is immaterial that the plaintiff in error did not fix the wages and did not select Putkonen as an employee. The record shows it had complete control of his services and that it refused to permit him to go to work on August 5, 1932. The power to refuse to accept him implies the power to dismiss him, if for any reason the plaintiff in error had seen fit to do so. The relation of employer and employee is established by such a showing as is here pre-

sented. See *McLaughlin v. Antrim County Road Commission*, 266 Mich. 73, 253 N. W. 221."

Many of the articles in law reviews, as well as a few opinions, refer to an English case as the pioneer case, because the unemployed workmen act of 1905 (5 Edw. 7, ch. 18) preceded our laws on this subject. This case of *Porton v. Central (Unemployed) Body for London* (1909) 1 K. B. 173, was disposed of in 1908 by the King's Bench division. Action was brought by the widow, and the facts may be briefly stated as follows: In January, 1908, Albert G. Porton, a parishioner, being out of work, applied to the Kensington distress committee, which satisfied themselves of the propriety of the application, and referred him to the central (unemployed) body for London, which gave him an employment card and a leaflet giving the rules for employment in parks, covering the wages paid, the hours, time allowed for dinner, traveling expense, and deduction of time lost through bad weather, and that a pay ticket would be given each Friday. On April 29, 1908, while so employed, he went to a latrine and was seized with an epileptic fit, and fell into the trench, and died the same day. The county court judge held he died from injuries which arose out of his employment, and assessed compensation of 150 pounds. The barrister for the central body argued it was not employment, but administrative relief, and there was no free choice on each side. However, the court said he was a deserving man, really unemployed, and, because he was hard up, was willing to take work under more disadvantageous conditions than he would at other times. He accepted the job offered under the conditions. "If it was not a contract of employment I cannot imagine what it was." Lord Justice Sir J. Fletcher Moulton adds: "I am of the same opinion. To my mind it is clear that the intention of the Legislature was to constitute this Central Body as a body empowered to employ at wages those who were in a destitute condition. They did employ this man at wages, and the scheme of the workmen's compensation act, to my mind, makes compensation for accidents almost inseparable from wages, and cer-

tainly inseparable from a contract of service, which I think existed here."

In the annotation, 96 A. L. R. 1163, it is said that a respectable line of authorities (which are cited) sustain what is called this English view, that the relationship of master and servant, within the meaning of the compensation laws, is not defeated by the fact that the employee is receiving work under one of the various plans designed to relieve unemployment.

In an entirely new subject, such as compensation to injured relief workers, the law magazines have been most helpful. Among the articles we have found to be of value may be mentioned: 85 University of Pennsylvania Law Review, 230; 16 Boston University Law Review, 772; 2 University of Chicago Law Review, 660; 20 St. Louis Law Review, 186; 7 Rocky Mountain Law Review, 158; 10 Washington Law Review, 218; 9 University of Cincinnati Law Review, 311. The compilations of the states into classes in this opinion, and many other helpful suggestions, have been taken from the excellent article in 36 Columbia Law Review, 555.

It is not possible to say that the majority of courts have held for or against the proposition submitted in the case at bar, for while many states have adopted the old idea that, when the sovereign supports an indigent man, it is entitled to his services and earnings to aid in his support (48 C. J. 543), other states, where right to recover compensation is denied relief workers, not only follow the old ideas in regard to paupers and charity workers, but believe a relief worker should not have a two-fold benefit of relief pay and also compensation when injured, and that no contract of employment exists.

"Where the work is given merely to keep idle hands busy, denying relief seems not undesirable. * * * But where the work has substantial economic value in advancing public improvement, the policy of the acts to impose the cost of human wear and tear upon the employer might well be decisive." 47 Harvard Law Review, 363.

Now, in the case at bar, the defendant insists that under sections 48-114, Comp. St. 1929, and 48-115, Comp. St. Supp. 1937, no person can have the status of an employee within the provisions of the workmen's compensation act unless he is in the service of the corporation sought to be charged under any contract of hire, express or implied, oral or written, and further charges that the relationship of employer and employee does not exist between a governmental body and a workman who is selected and paid by an employment relief organization and assigned by it to work provided for him by such governmental body, when such type of work constitutes a project specifically designed to furnish work for the unemployed; or, to state it another way, the city claims that the national government through the FERA, here known as the Nebraska emergency relief administration, apportioned to each of the states a large sum of money to pay those who do the work, and the state government takes charge of that money and pays it out for work done in that state, and the city insists that, where the government provides all the funds to pay for such labor, there is no relation of employer and employee between the city and the men working on such a project.

To meet these contentions, the plaintiff argues that, when the city exercised control over all the details of the work through the city's employees, with the right to object to and stop the service of any employee, when the city accepts the service and the results of the work, which is for its sole and exclusive benefit as a part of its public sewer system, the city is then bound by the provisions of the Nebraska compensation law, even though the wages are paid with federal funds as a relief project.

And here is a case exactly in point. It is the case of *Blake v. Department of Labor and Industries* (1938) 196 Wash. 681, 84 Pac. (2d) 365. An employee was injured while working on the Skagit river hydroelectric project. The foreman in immediate charge of the crew was employed by the county relief agency and also by the city of Seattle. The injured man received from the city clothing, lodging and

board, and from a relief agency $3 a week. This work at Skagit was a part of the city of Seattle's regular municipal operations. The court held that the respondent was an employee of the city of Seattle. Judge Millard, concurring in the result, states the rule of the supreme court of Washington, as follows: "In other words, we are committed to the rule that if the city or county engage one for compensation in the performance of extra-hazardous work in which the city or county is engaged the relationship of employer and employee is created and the employee is under the protection of the workmen's compensation act, irrespective of the fact whether the compensation of the employee be by supplies, or whether he be paid in cash which is contributed by a charitable organization, or by the Federal Government in whole or in part."

In Canada very liberal provisions have been made for relief workers. In Manitoba, on projects sponsored by municipalities, compensation is universal. In Ontario, Alberta, and Nova Scotia, relief workers are paid practically the same as in private industry.

There is a growing sentiment in many states of the Union to liberalize former laws and decisions to build a higher morale in relief workers. A few states will not go as far as one group of states and allow compensation to relief workers exactly the same as to other public employees, but have enacted laws setting up special relief administration machinery to handle compensation to injured relief workers. These states embrace several where courts have previously denied relief of this nature, and are Connecticut, Louisiana, Minnesota, Rhode Island, Washington, West Virginia, Wisconsin and Wyoming.

In eight other states special legislation was enacted to meet the local situation. In many of these, relief workers had been denied relief under the former workmen's compensation laws. The eight states are Idaho, Indiana, Nevada, New Jersey, New York, Ohio, Pennsylvania and Vermont.

These special acts in several of these states make the

amount of compensation paid relief workers considerably lower than the amounts provided for other workers.

It appears to be reasonable to distinguish between those who work for their support on relief projects and those who do not, but are simply kept in county farms or poorhouses. It is sound public policy to preserve the self-reliance of relief workers by granting them the same compensation for injuries as applies to all other public employees.

It is not often that such claims for compensation come before a court of last resort, because the financial position of a relief worker is such that, without outside help, litigation is practically impossible, and the plaintiff in the case at bar states in her brief that she regrets that lack of funds will permit her to file a brief only a fraction of the length of the brief of the city.

The city calls our attention to two Nebraska cases which may throw a little light on the question. In the case of *Dabelstein v. City of Omaha,* 132 Neb. 710, 273 N. W. 43, a large number of workers, as well as the timekeeper, foreman, and first-aid man, were all directly employed and paid by the federal government. The work at the time plaintiff was injured was to take up street railway rails, and one rail fell on the instep of plaintiff's right foot. He brought suit against the city of Omaha and the street railway company. His injury was caused by fellow men working for the government. The trial court and this court concluded that the evidence was insufficient to bear a construction that the plaintiff was an employee of any kind of either defendant.

The case of *Drum v. Omaha Steel Works,* 129 Neb. 273, 261 N. W. 351, involved the construction of a bridge over the Loup river south of Columbus as a federal aid project. It was said: "While this federal enactment does not abrogate the provisions of the workmen's compensation law of the state, the federal government could provide that the contract should contain the same conditions. The contract in this case between the state of Nebraska and the Omaha Steel Works did contain these provisions."

The city of Lincoln had full control of, and dictated, the details of the work, and had the right to accept Hendershot's services or to discharge him from the job. Hendershot had the right to accept the proffered work or reject it. It was entirely voluntary. The city accepted the services, and is now using the public sewer system upon which the work was done. The relations between them were clearly that of a municipal corporation as employer and Hendershot as a public employee. The city to all effects said: "If you want a job, come down and my foreman will try you out." He came and was found satisfactory, and became a public employee.

The fact that the federal government had furnished funds to the Nebraska emergency relief administration, out of which the wages were paid, does not prevent the operation of the Nebraska compensation law, for the city applied to be granted money to complete this sewer project, and accepted the money to pay the men, and controlled their labor on the sewer construction, which was for the sole benefit of the city, and therefore cannot avoid paying the award. Affirmed, with an attorney's fee of $150 in this court.

AFFIRMED.

JOHNSEN, J., concurs in the result.