ESTELLA C. MOOK, APPELLEE, V. CITY OF LINCOLN ET AL., APPELLANTS.

9 N. W. (2d) 184

FILED APRIL 16, 1943. No. 31542.

*Kennedy, Holland, DeLacy & Svoboda* and *Edwin Cassem,* for appellants.

*Frederick J. Patz, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

YEAGER, J.

This is an action under the workmen's compensation statutes wherein Estella C. Mook, plaintiff and appellee, seeks to recover workmen's compensation on account of the death of her husband, Albert L. Mook, from the city of Lincoln, his employer, and the Travelers Insurance Company; the compensation carrier for the city of Lincoln, defendants and appellants. Plaintiff claims that her husband died as the result of an accident sustained February 18, 1941, while he was engaged in the performance of his duties as a city fireman.

The action was first tried to one judge of the compensation court where an award as to compensation in accordance with the claim was rendered in favor of the plaintiff.

On the last day for appeal the defendants filed a waiver of rehearing before the full compensation court and sought to take an appeal to the district court. On the same day, but after waiver of rehearing before the full compensation court by the defendants, the plaintiff filed an application for rehearing and modification of the award, claiming that the award was erroneous in that there was a failure to award medical expenses, a statutory attorney's fee and proper costs. Over objection of the defendants rehearing was had to the full compensation court. On rehearing the full court rendered an award sustaining the previous award and making proper allowances for medical expense, attorney's fees and costs.

From the award of the full compensation court an appeal was taken to the district court where the award of the compensation court was sustained. From the award of the district court the case comes here on appeal.

Two important questions are presented for determination by this appeal. The first is the propriety, under the circumstances, of allowing the rehearing before the full compensation court following the waiver of rehearing by the

defendants who were ostensibly the losers at the hearing before the one judge, and the second is that of whether or not Albert L. Mook came to his death accidentally within the meaning of the workmen's compensation statutes. We will deal with these questions in the order set forth.

On the question of rehearing, the statutes in section 48-174, Comp. St. Supp. 1941, provide as follows: "(5) Either party at interest who refuses to accept the findings, order, award or judgment of the said judge may, within fourteen days after the date thereof, file with the said court an application for a rehearing, plainly stating the errors on which such party relies for reversal or modification."

This language is clear and specific. The application of the plaintiff strictly conformed with the plain provisions of this statute and there is no way that this court could deny that right except by judicial legislation. This we are unwilling to do.

This court held in *City of Lincoln v. Nebraska Workmen's Compensation Court,* 133 Neb. 225, 274 N. W. 576, in an interpretation of this provision as follows: "The right of either party to a 'compensation proceeding' to refuse to accept the findings, order, award or judgment of the judge of the Nebraska workmen's compensation court who is assigned to hear the same, and to secure, in the manner provided by law, a rehearing or retrial thereof by such compensation court and a determination by a majority of the members thereof, is paramount to, and exclusive of, the right of appeal from such original decision."

It is the acceptance of the award, or perhaps more aptly stated, it is the failure to make application for rehearing in the manner provided by statute that defeats the right to a rehearing. *Shamp v. Landy Clark Co.,* 134 Neb. 73, 277 N. W. 802.

As to the second question, there is no doubt that Albert L. Mook fell while he was engaged in the performance of his duties as a city fireman. There is no doubt that he died at least within the space of a few minutes, if not instantly. The question for determination is whether he died as a result of the fall or fell as the result of his death.

Albert L. Mook, a city fireman, on the evening of February 18, 1941, shortly after seven o'clock p. m. responded with other firemen to a fire call at 2401 Lynn street, Lincoln, Nebraska. The temperature was perhaps about 15 degrees above zero or lower. The house faced to the north and on the south end was a room the roof of which was four or five feet lower than that of the other part. In the east side of the main roof was a dormer. The fire appears to have been in the vicinity of the dormer. The fire, at the time of the fall of Mook, appears to have been under control. At the time of the fall there was a ladder extending from the ground against and above the roof of the lower room and another against and above the main roof somewhat to the south of the dormer. A third ladder was hooked over the ridge and was lying flat on the higher roof and also to the south of the dormer. Mook and another fireman were on the east side of the higher roof and in the vicinity of the two ladders at the time of the fall and a third was inside the dormer. From the evidence it is not clear what position Mook was in when his fall began. It was variously testified that he was on the roof with his toes between the boards from which shingles had been removed; that he had been lying on the ladder which was flat on the roof; that he was standing on the ladder that extended up from the ground and that he was leaning forward toward the roof; that one foot was on the standing ladder and the other on the roof. Some of the evidence would indicate his fall started when he was in an upright position and some that he was not. The manner of the fall is clothed in the same degree of uncertainty. Some of the evidence would indicate that his foot or feet slipped on the roof and that he reached for the ladder or the roof and plunged from the higher to the lower roof where the fall was arrested by the ladder to the lower roof and a hose which was on that roof; some that he slipped on the ladder and from there the plunge took place; and some that from his position on the roof, with arms extended as in a dive, the plunge was taken to the lower roof. Some of the witnesses testified that the top of

the ladder slipped to the south but not far enough to fall onto the lower roof. The fireman who was on the roof with Mook denied this and stated that he descended the ladder immediately after the fall and that it was then in its original upright position.

Mook made no sound and uttered no word as the plunge was taken except "Oh, gee!" The fireman who was on the roof heard these words, turned and saw the completion but not the start of the plunge. Immediately before Mook had been removing charred shingles from the roof in the vicinity of the dormer.

As soon as possible after the fall he was removed from the roof and into the house where he was placed with the front of his body downward on a davenport with his head turned to the side and attempts at artificial respiration applied. Some minutes later the fire chief arrived on the scene and according to his testimony felt a pulse. On cross-examination he testified that on a former trial he testified that he thought he could feel a flutter in the pulse. He further said that Mook was gasping at intervals of perhaps three seconds. On the former trial he testified that the gasps came at intervals of from a minute and a half to two minutes. Shortly thereafter Mook was pronounced dead by two doctors who had come to the scene. The fire chief observed a skinned place on the left side of the face around the cheek and left temple.

On the second day after the death an autopsy was performed on the body by Dr. George W. Covey who was assisted by Dr. Helmut Zinneman. Other doctors were present during all or a part of the autopsy but no further mention of this fact is required since these other doctors did not give testimony in the case.

The findings of Dr. Covey, to the extent that it is necessary to set them forth here, were the following: There was no external evidence of skull or other bony injury. There appeared to be a slight bruise on the face which was covered by embalmer's makeup. The pleural cavity was free from adhesions and it contained no excess fluid. The peri-

cardial cavity was free from adhesions and contained no excess fluid. The heart was heavier than normal and slightly increased in size with the left ventricle preponderating. There were some yellow atheromatous plaques on the inner auricular wall under the epicardium, in the left auricle and above the mitral valve. The anterior leaflet of the mitral valve shows sclerotic thickening. The cavity of the left ventricle was slightly increased in size. Fairly large patches of fibrosis were found in the posterior wall in the left ventricle near the apex which fibrosis involved chiefly the inner half of the myocardium next to the ventricular cavity and extended to the left margin of the heart and more than half way upward to the base of the ventricle. The anterior descending branch was extensively involved by atherosis and in a number of places the lumen was reduced to a narrow slit but there was no apparent complete occlusion. On the posterior portion of the heart the circumflex branch showed marked atheroma and one of the main branches along the posterior wall of the left ventricle supplying the fibrosed area was completely occluded for some distance. The main branch of the right coronary was competely occluded for a distance of about two cm. by an old thrombus or by atheroma. The abdominal aorta was the seat of extensive atheromatous changes, calcification and so-called ulceration. The thoracic portion was slightly affected by sclerotic changes. The examination disclosed no signs or evidences of traumatic injury notwithstanding a microscopic check was made of the tissues and organs examined, which showed an old coronary thrombosis with myocardial scar tissue, which thrombus had been recanalized and calcium deposits were encountered in the organized thrombus.

Based upon his findings and a hypothesis embracing the age of Mook, which was 52 years, his previous activities which included regular employment on the fire department, assistance with heavy work on a farm, frequent wrestling with other firemen, evidence that he had always been in apparent good health, that he had a year or two earlier passed an examination for life insurance, the fact that a part

of the rim of a helmet, to the back and right thereof, was broken off, and all of the evidence relating to the fall and the immediately succeeding events, Dr. Covey gave as his opinion that the cause of death was myocardial failure as the result of extensive coronary sclerosis and occlusion with old myocardial fibrosis.

Dr. Helmut Zinneman gave an opinion as to the cause of death. His opinion was the same as that given by Dr. Covey.

On the other hand Dr. Arthur L. Smith, on a like hypothesis with the findings of Dr. Covey before him, gave it as his opinion that death was caused by brain concussion which concussion came about as a result of the fall. He concluded from the hypothesis that the fall and death were not coincidental but death succeeded the fall by a space of several minutes. His opinion depended in a large measure upon the testimony of the fire chief that there was a pulse after the fall and that there was gasping. It is apparent that in the rendition of his opinion he accepted as established that there was a pulse when the fire chief made his examination. It is likewise apparent that his opinion took into account an entire lack of physical or objective finding of trauma in the autopsy except the bruise on the face and the abrasion on the forehead.

It was his opinion that if death had been the result of myocardial failure the fall as described by the witnesses could not have taken place and there could have been no pulse after the failure.

It may be stated here with regard to the fall that the evidence as to the manner thereof is unsatisfactory and uncertain. No two witnesses describe it in the same way and not even a single witness is certain as to all of the aspects of the fall as described by him or her. This is not particularly surprising since the fire was at night and what was seen by all witnesses except the fireman who was on the roof was seen from the ground or from the interior of a house some 20 feet away by the lights from the adjacent house and from an automobile somewhere generally between the two

houses and perhaps aided to some extent at times by a flash-light. One thing however does appear to be certain and that is that Mook plunged from the higher onto the lower roof and that he did not simply slump or wilt and fall or roll onto the lower roof.

Dr. Smith states substantially that this is inconsistent with myocardial failure and is consistent with his theory that it was the fall that caused the death.

Dr. Smith was of the opinion that there was a brain concussion which caused the death. We think it fair to say that a brain concussion is a brain injury. He says that there may be a brain concussion sufficient to cause death without visible evidence of injury. Dr. Covey is in disagreement with him on this point. Dr. Covey states that there can be no injury to the brain sufficient to contribute to death which could not be revealed by a microscopic examination.

Dr. Covey further said that death caused as he says this one was caused would not be so instantaneous as not to permit the raising of the hands and the uttering of the expression, "Oh, gee." He also stated that the sort of death described by him resulted in sudden death to 11 per cent. of the individuals at the primary attack. He also said that in all probability the death was as sudden and instantaneous as death ever is. He said that in such cases they just fall like a person fainting, they just crumple and go down; they do not necessarily fall forward or backwards. His explanation of what he means by instantaneous death is the following: "Instantaneous death does not mean they are dead in an instant. They become unconscious, they may move, they may gasp, their hearts may beat for a considerable period of time, and yet those must be classified as instantaneous deaths, if that term can be used." A further definition assented to by him is the following: "That condition where almost instantly the condition of the patient becomes irretrievably fatal, although there is activity of the cells and spasmodic function of the organs may persist over a varied period of time, from several seconds to many minutes thereafter."

He further stated that in his opinion Mook was to all intents and purposes dead before he hit the second roof, sufficiently dead so that he could not react in such way that he would do anything to help himself. Again he said that he might move, he might gasp, he might have convulsions, movements of his extremities, or something of that sort, but he would be essentially dead as far as the heart and the nervous system were concerned. On the question of the heart Dr. Covey said that the heart might beat thirty minutes after he was actually dead for all intents and purposes. With regard to the beat claimed to have been found by the fire chief Dr. Covey said: "That might well be. Hearts do beat for a long time after the patient is essentially dead."

On the question of performance of occupational duties preceding death caused as Dr. Covey states that this one was caused, he said that the performance of ordinary daily duties is not inconsistent with this kind of death.

It is upon these two opposing opinions as to the cause of death of Albert L. Mook, fortified as outlined, that this court is required to make a determination of this case. The determination must depend upon the question of whether or not the plaintiff has established by a preponderance of the evidence that Mook sustained an injury, which caused his death, arising out of and in the course of his employment, which proof must be made by evidence leading either to a direct conclusion or a legitimate inference that such is the fact. *Holtzendorff v. Eppley Hotels Co.*, 140 Neb. 525, 300 N. W. 411; *Feeney v. City of Omaha*, 140 Neb. 497, 300 N. W. 571; *Rose v. City of Fairmont*, 140 Neb. 550, 300 N. W. 574; *Lange v. Department of Roads and Irrigation*, 141 Neb. 167, 3 N. W. (2d) 194.

It is our opinion that the plaintiff has failed to sustain the burden imposed upon her by the law. When the testimony supporting the opposing views is weighed one against the other we find it much less difficult to accept the view of the defendant than of the plaintiff. This alone would require a reversal of the award. There is another and cogent reason why the award cannot be sustained.

The statute (section 48-152 Comp. St. Supp. 1941) defines an accident within the meaning of the workmen's compensation laws as: "The word 'accident' as used in this Act, shall * * * be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." In the same section of the statute injury is defined as follows: "The term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom."

Disregarding for the moment the contention or the evidence on behalf of the defendants and assuming the truth of all of the evidence of the plaintiff there is proof of accident but there is a lack of evidence of violence to any physical structure the consequence of which could have caused death as Dr. Smith contends that it was caused. More explicitly, there was evidence that there were facial injuries which indicated violence to physical structures but Dr. Smith appears to attach to them no particular significance except as evidence of a severe fall. It was from the evidence of the fall coupled with the evidence of a pulse, rather than violence to physical structures that Dr. Smith concluded that there was a brain injury or concussion. His opinion contemplates an entire lack of evidence of violence to the brain or any other physical structure surrounding or functioning with the brain.

On the basis of plaintiff's testimony there has been a failure to establish by the quality of proof required by law that the death of Albert L. Mook was accidental within the meaning of the workmen's compensation law. The cause of death on this evidence remains in the realm of speculation and conjecture.

This court has said: "When an employee dies suddenly and mysteriously while engaged in his work, the burden of proof that his death was an accident arising out of his employment rests upon the claimant for compensation, and such proof must amount to something more than mere

guess." *Mullen v. City of Hastings,* 125 Neb. 172, 249 N. W. 560; *Shamp v. Landy Clark Co., supra.*

The mystery involved in this statement cannot with reason be limited to a lack of view by witnesses of the incidents culminating in death as was true in the cases cited, but must embrace also the factor or thing which produced death. A death, within the meaning of this pronouncement, may be as mysterious as to cause, with witnesses observing the incidents leading to it as without.

It is therefore our opinion that the award and judgment of the district court are not supported by sufficient evidence and in consequence they are reversed and the action dismissed.

REVERSED AND DISMISSED.

PAINE, J., dissenting.

I respectfully dissent from the opinion adopted by the majority of the court.

This action is brought by the widow of a city fireman against the city of Lincoln and the Travelers Insurance Company, its compensation carrier. There was a hearing before Judge Frank M. Coffey, of the compensation court, and the widow was allowed $15 a week for a period of 325 weeks and $150 funeral benefit. There was then a hearing before the full compensation court, and the same award was affirmed. The defendants then appealed to the district court, and Honorable Frederick E. Shepherd, district judge, affirmed the same award which had been made twice before, and added the sum of $100 as attorney's fee for the plaintiff's attorney.

We have held that "On appeal from the district court to the supreme court in a workmen's compensation case, findings of fact supported by sufficient evidence and findings of fact on substantially conflicting evidence will not be reversed unless clearly wrong." *City of Fremont v. Lea,* 115 Neb. 565, 213 N. W. 820. See, also, *Lange v Department of Roads and Irrigation,* 141 Neb. 167, 3 N. W. (2d) 194; *Pillard v. Lincoln Packing Co.,* 133 Neb. 898, 277 N. W. 587. Therefore, if this court reverses this award in the case at

bar, the court must find that the result was clearly wrong.

The defendants have brought this case to this court on the theory that the deceased suffered no accident at all, but just happened to have a fatal heart attack while up on the icy roof vigorously fighting this fire.

It will be necessary to refer to the ladders used at this fire. The main ladder extended from the ground up to the eaves of the main roof and a few rungs beyond the main roof, and the deceased was standing near the top of this ladder, or on the boards of the roof where the shingles had been torn off, or perhaps with one foot on a round of this main ladder above the roof, or he might have been leaning against it. The kitchen ladder extended from the ground to the eaves of the kitchen at the rear of the cottage, which was a 1½-story building. This short ladder to the kitchen roof brought up the large water hose, which was fastened to it, then went over to the main roof of the house. The third ladder was called a roof ladder, and was laid flat upon the roof of the main house, and hooked over the ridge of the house.

Defendants rely upon the testimony of fireman Keller, who they state was entirely honest, and if the plaintiff had not called him as a witness the defendants would have called him to testify. There were just the two firemen, Keller and the deceased, up on the roof at the moment of the accident. Keller says he was talking with the deceased a little bit before, and he was standing on the roof, and then Keller turned around and started pulling shingles off the roof of the dormer, with his back to deceased, and then he heard the deceased say, "Oh, gee," and when he turned around and looked the deceased was in mid-air, with his hands outstretched, but he did not see him start to fall, for when he first saw him after he turned around the body of the deceased was entirely over the edge of the roof, falling to the kitchen roof. He testified that the deceased fell 4½ or 5 feet to where he hit the kitchen roof; that there was smoke that would "make you cough," and steam coming up around them at the time he fell. He said he did not see how the

deceased hit on the kitchen roof, as that was over the edge of the house.

Reverend J. Edwin Jarboe testified that he is a minister, and resided in the next house east, the houses being 18 or 20 feet apart, with a driveway between; that he had been speaking at the City Mission that night, and drove up the alley and in from the back, leaving the headlights on his car burning, which lighted up the yard and the house where the fire was; that he went right in the house and went into his study, where the folks were standing by a large window looking out; that his wife and his daughter-in-law and his wife's mother were there, and this large window of his study was directly east of the place on the roof where these men were working. It was freezing weather, and he had seen firemen throw water up on the roof before the fireman fell, and the roof was pretty icy and wet. He described the ladder at the back of the kitchen and the long ladder going up to the main roof, and saw the two firemen digging away at shingles. He testified that the man who fell was working down below the other man. One was working rather toward the top of a dormer window, and the man who fell was pretty well down. He "was kind of laying on the ladder and working away with his hands" at the shingles. The roof of the main part was a very steep roof, and as the deceased was working by the side of the dormer window several of them in the room said, "That ladder is falling," and as he started to fall it seemed like he lost his balance on the ladder, and he rolled off onto the other roof. As the ladder started sliding and went to the edge of the roof, Reverend Jarboe saw him throw out his hands like he wanted to catch onto the edge, trying to catch himself. It just appeared as if he was clutching to get hold of something. When he came down he lit on his head and shoulders on the kitchen roof and then rolled down to the edge of the roof. Reverend Jarboe said he followed them into the house as they took him in, and saw that his face was bruised, and there was some blood.

Mrs. J. Edwin Jarboe testified that she was standing in

their study window, looking directly across at the other roof, which looked icy. She said: "All at once I saw the ladder begin to slip. The man was on the ladder, * * * and he tried to catch himself * * * with his arms. The ladder fell and caught on the hose line which was lying along the edge of the roof." On cross-examination she testified this main ladder slid about to the edge of the main roof. She testified that there was plenty of light, for the light from the study window shone directly out, and she had turned her porch light on, and that Reverend Jarboe had left the car lights on, shooting the lights toward the house, and it was very plain to see what was going on around there.

The death certificate, signed by Max G. Towle as county coroner, dated after the autopsy was held, stated, "Real cause of death unknown."

Defendants' medical expert was asked the question, "Is it your opinion, then, that he was dead before he hit the second roof in falling from the upper to the lower?" and his answer was, "It would be my opinion from my findings."

Two high school boys were standing in the driveway in front of the Jarboes' window. Their attention was attracted when the long ladder slipped just a little ways to the south, but not over on the kitchen roof. They saw deceased put out his hand to grab the south edge of the roof, and Fred Langenheim said he lit on the left side of his face and neck and shoulder. Don Singleton said when they were carrying him inside the upper part of his cheek was red and blood was just starting to come. He testified that deceased grabbed at the ladder with his left arm and hand; "he missed it or he would have got himself steady."

The plaintiff called Dr. George E. Lewis, who had examined the deceased for life insurance in August, 1940. He said he examined his heart action by stethoscope on his bare chest, took his pulse and blood pressure, and found his heart to be normal at that time.

In answer to a long hypothetical question, detailing all the occurrences leading up to the death of Mr. Mook, he

testified "That the injuries he sustained from the fall directly or indirectly caused Mr. Mook's death."

The medical expert called by the plaintiff testified, in answer to a long hypothetical question, that in his opinion death was caused by a concussion of the brain, brought about by the fall.

He was then asked this question: "From the facts as given to you in the hypothetical question, do you think it was possible for this man to have been dead before he hit the lower roof?" and the answer is, "No, he could not have been dead, for two reasons. One is that he made definite grabs at protruding objects, and the other is the (fire) chief decided his heart was beating, still beating, for fifteen minutes afterwards."

What have courts said in similar cases?

"Compensation may be awarded, although there was preexisting heart disease, if disease was aggravated or accelerated by accidental injury." *Farrow v. What Cheer Clay Products Co.*, 200 N. W. 625 (198 Ia. 922).

"Where employee has preexisting disease, which is aggravated through injury and death results, recovery may be awarded under Workmen's Compensation Act." *Emery v. Ottumwa Direct Service Stations*, 262 N. W. 786 (220 Ia. 885). See, also, *Hanson v. Dickinson*, 188 Ia. 728, 176 N. W. 823.

In *Nicholson v. Roundup Coal Mining Co.*, 79 Mont. 358, 257 Pac. 270, it was held that the fact that the employee was suffering from a heart disease does not preclude compensation, when it appears that the disease was aggravated or accelerated by an accidental injury which arose out of and in the course of the employment.

In the case of *Lindeken v. Lowden*, 229 Ia. 645, 295 N. W. 112, a knee injury suffered by a boilermaker aggravated a coronary sclerotic condition, which brought about death. The court said (p. 658): "We have also repeatedly held that though the injury aggravates or accelerates a physical impairment with which the employee is afflicted, the injury is compensable if death resulted therefrom at a time ear-

lier than it would have occurred had not the injury been suffered."

"Existence of pulmonary tuberculosis and of tuberculosis of throat did not defeat compensation for total disability resulting from aggravation of incipient Pott's disease through accident." *Weller v. Consumers Power Co.,* 250 N. W. 298 (264 Mich. 525).

It has been held that death from heart trouble, following an injury received by an employee when he was thrown from a horse while in the pursuance of his duties, is the result of an injury arising out of and in the course of the employment, where the evidence shows that the employee, though a robust man, was afflicted with heart disease and, following the injury, rapidly declined in health until the date of his death. *Lachance's Case,* 121 Me. 506, 118 Atl. 370.

We will now consider former decisions of this court in cases similar to the one at bar.

In *Gilcrest Lumber Co. v. Rengler,* 109 Neb. 246, 190 N. W. 578, 28 A. L. R. 200, where an employee suffered a slight bruise upon his shin, which was not sufficient of itself to cause disability, but which three days later, owing to the diseased condition of his blood, formed an ulcer, we held that his disability was caused by an accident arising out of and in the course of his employment.

In the case of *Miller v. Central Coal & Coke Co.,* 123 Neb. 793, 244 N. W. 401, an employee was down on his knees under a counter, cleaning the office floor at night. Hearing someone enter the office, he arose quickly and struck his back and shoulder on the corner of the counter. As a result his back and shoulder became black and blue and swollen. He continued work for 19 days thereafter. He was then treated by physicians until some time in September, when notice of his disability was filed. Blood tests disclosed a syphilitic condition, which had become aggravated by the injury, and physicians declared that he was totally disabled in their opinion. This court allowed compensation, holding that where an employee, in the course

of his employment, suffers an injury to his back and shoulder, causing a dormant disease to flare up and disable him, he is entitled to compensation.

In the case of *Hendershot v. City of Lincoln*, 136 Neb. 606, 286 N. W. 909, a bricklayer, working at the bottom of a sewer ditch, was accidentally hit on the back of the head by two bricks. Several days later he was able to go to the grocery store, but the headache continued. On Friday and Saturday he did part-time work on the sewer job, but collapsed on the job, suffered a chill, and died from lobar pneumonia two weeks after he was injured. Two doctors testified that, because he was hit on the head, he was weaker than he normally would be, and in his weakened condition his resistance to the lobar pneumonia organism was lowered, and therefore it was stated that the lobar pneumonia came as a result of the original injury to his head, and this court allowed recovery of compensation because of the accidental head wound lowering his resistance to the pneumonia germ.

Now, in the case at bar, the deceased performed the hard work of sawing up trees with a crosscut saw two or three weeks before his death, he took part in scuffling and wrestling with other firemen almost every day, he never stopped to rest, nor had shown any shortness of breath, all as testified to by fireman Keller. Those working with him saw no signs of ill health. No one ever knew of his having heart disease.

The typewritten report on the autopsy, exhibit No. 5, is replete with medical terms which explain the exact condition of his heart and the blood vessels connected with it, and the medical expert declares the organ was not normal. But was it not evident to the judges of the compensation court and to District Judge Shepherd that the condition of the heart, as testified to by the medical expert for the insurance carrier, was not the sole cause of death?

Let us patiently review the facts as testified to by the witnesses. When the deceased felt the ladder partially supporting him slipping on the icy roof, he grabbed for the

edge of the roof, and exclaimed, "Oh, gee," and fell to the kitchen roof below, striking on his head.

When removed from the kitchen roof by assistant fire chief Feaster and taken into the house and laid on a davenport, Feaster testified that he threw the light in his face and saw that the deceased was having trouble with his breathing, so they laid him on the floor and started artificial respiration, and his pulse continued to beat faintly for perhaps 15 minutes.

Do not these actual facts compel us to reach the conclusion that a big, strong, husky fireman, who had been able to hold up his end in any kind of work or athletic exercise, suffered an accident, and that the shock of striking his head when he fell on the roof may have at once awakened the latent or dormant heart condition, and finally resulted in his death from a heart condition which he did not know he had?

But, as this court held in the *Hendershot* case, if the concussion of the brick striking the head of Hendershot resulted in a weakened condition which made him an easy prey to pneumonia, from which he died, by the same reasoning might not the accident suffered by the deceased, the evidence of which is clearly convincing, have produced the shock which finally resulted in his death some minutes later from heart disease?

The testimony in this case indicates that, if the deceased had been stricken on the roof with a fatal heart attack, as defendants insist, ordinarily he would have limply fallen to the roof, and been to all intents and purposes stone-dead that moment. But the evidence does not support any such conclusion. He was not limp, he grasped at the edge of the roof and other objects to prevent his falling, he yelled, "Oh, gee," and his respiration and pulse continued for some moments after he was removed into the house.

Who can deny that deceased suffered an accident, established by so many eyewitnesses? And, if deceased did suffer this accident first, which hastened his death, his widow is entitled to the award of compensation granted to her in each of the three former hearings in this case, under the

liberal interpretation required by our statute in compensation cases.

It may be argued that plaintiff cannot recover if deceased finally died from heart disease following an accident, because in her answer she said in paragraph 7: "That Albert L. Mook's death was due to an accident received while in the employ of the defendant, city of Lincoln, and while engaged in the performance of his duty in the course of his employment and *was not due to heart disease* and that said death arose out of said employment by reason of said accident."

This court has said: "Considered as a whole the evidence does not, it is true, respond to the averments of the petition; but the variance is not in an essential matter and should, at this stage of the litigation, be altogether disregarded, for it is evident that it did not mislead the defendant to his prejudice nor embarrass him in making his defense upon the merits." *Toy v. McHugh,* 62 Neb. 820, 87 N. W. 1059. See, also, *Westing v. Chicago B. & Q. R. Co.,* 87 Neb. 655, 127 N. W. 1076; *Parker v. Omaha Packing Co.,* 85 Neb. 515, 123 N. W. 1026.

This court has held that, under a familiar rule often acted upon, the pleading may be amended as well after as before judgment to correspond to the proofs. See *Raley v. Raymond Bros. Clarke Co.,* 73 Neb. 496, 103 N. W. 57; *Swan v. Bowker,* 135 Neb. 405, 281 N. W. 891.

It is quite clear that to allow an amendment of this nature would not in any way change the cause of action (*First Nat. Bank v. Myers,* 44 Neb. 306, 62 N. W. 459), nor would it mislead the defendant, but in the interest of justice would permit the pleading to be amended to conform to the facts proved by the evidence.

In my opinion, this case should not be reversed, as the findings of fact were supported by sufficient evidence to warrant an affirmance of the award made by the district court.