THOMAS v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5804. Decided May 11, 1938. (79 P. 2d 1.)

Rehearing denied July 5, 1938.

*Dean E. Flanders*, of Salt Lake City, for plaintiff.

*Joseph Chez*, Atty. Gen., and *F. A. Trottier*, of Salt Lake City, for defendants.

LARSON, Justice.

Certiorari to the Industrial Commission to review its action in denying an award for permanent total disability resulting from an accident sustained in the course of employment. Applicant was injured July 15, 1925, in a fall when some timbers gave way in the Godiva Mine at Eureka, Utah. He sustained a fracture of the neck of the right femur and injuries to the hip and elbow. After approximately three months under the doctor's care and in a hospital he was sent home. Not until December 26, 1925, was it discovered that he had a fracture. In January, 1926, he was taken to a hospital and subjected to a surgical operation. A bone peg was taken from the left tibia or shin bone and inserted in the neck

of the right femur and the head in an effort to secure a bony union. Following this operation and as a result thereof applicant developed a thrombophlebitis in both legs, being especially acute and severe in the deep veins of the left leg. Four months were spent in the hospital, two subsequent returns thereto for periods of time were made, and one further operation was had. The phlebitis subsided in the right leg, but in the left leg the deep inner veins were so affected that all *valves* were destroyed, resulting in sclerosis of the veins. The operation failed to effect a bony union and the right leg atrophied, wasted away, and shortened until it became totally lost industrially; that is, as far as service is concerned equivalent to an amputation. Whenever applicant attempts to walk or stand for any length of time, his left leg, due to the impeded veinous circulation resulting from the thrombophlebitis, becomes extremely painful, swells badly, and breaks out in varicose ulcers, necessitating medical treatment and long periods in bed. One such occasion lasted for eighteen months; another for four months; and others for shorter periods of time. Due to this impaired circulation, the left leg failed to effect a good healing where the bone peg was taken from the tibia. There are evidences of osteomyelitis in the bone, and the place where the incision was made tends to ulcerate. Applicant has made a number of efforts to work, but in each instance after an hour or two, due to the pressure and pain in the left leg, he collapses and then ulcers develop on the leg. He then tried such jobs as sorting apples, where the worker could sit down, but due to the conditions of the right hip and leg resulting from the fracture he must sit in a sidewise and semireclining position which soon becomes exceedingly painful.

In addition to the medical and hospital services he was paid disability compensation for the full period of six years, the maximum allowable under the law unless his disability is total and permanent. When such payments stopped, applicant applied to the commission for an award of compensaas for permanent total disability. The commission, by a 2

to 1 decision, denied the award; Commissioner Knerr dissenting. And so the cause comes here on certiorari presenting the single question: Was the applicant under the facts shown in this record totally and permanently disabled as a matter of law?

At the hearing before the commission, and there is no dispute in the evidence, the following conditions appeared: The right leg is a total loss industrially. One doctor said it were better amputated. The applicant cannot sit at a table to work, because he must sit sidewise and in a semireclining position. Even such position after a few minutes becomes very painful. The left leg, due to the thrombophlebitis, does not permit standing for any length of time or walking any distance. As soon as the leg is used in standing or walking, for even an hour, it swells abnormally and becomes so painful that the applicant becomes ill and sometimes collapses. Ulcers then break out on it which completely and totally incapacitate him and confine him to his bed for long periods of time. There is evidence of osteomyelitis in the shin bone, and it is extremely doubtful if anything can be done to relieve his condition. Any such effort would require at least eighteen months of hospitalization, and chances are against improvement. His condition will become progressively worse. From the waist up his physical condition is good, but in intellectual training he did not complete the grade school. His labor experience has been limited to ranching, cattle, and mining, neither of which he can do now. He has tried to work at cleaning up around the mine, shoveling dirt, sorting apples, etc., and canvassing, but because of his legs he can do none of these. There is no evidence that he could do any kind of work. He cannot knit or crochet, lacks the imagination to write novels, or the mentality to write other books or treatises, and about the only thing open to him is to "lie supinely on his back and hug the delusive phantom of hope." In a report to the commission signed by Dr. D. K. Allen and Dr. Martin C. Lindem, it is said:

"It is our opinion that at this time the man cannot do manual or other physical labor because of the recurrent thrombophlebitis. He should have * * * obliteration by sclerosing injections of the varicose sinuses of both legs. It would be our recommendation that temporary *total* disability be extended for one year or eighteen months for this treatment * * * and at the end of that time the question of whether he is permanently disabled should be settled."

They find, as does all the medical testimony, that he now is totally disabled, and unless the treatment suggested helps him when applied for over a year or eighteen months, his total disability would be permanent. As to the chances of such treatment improving his condition, Dr. Root, an experienced and very reputable physician, testified that the deep veins of applicant's leg were sclerotic; that the treatment suggested might help on superficial veins, but cannot be used on the deep veins. Even Drs. Allen and Lindem were not optimistic about results of the proposed treatment, but suggested it be tried as an experiment. Dr. Root further testified that there was no contrivance or apparatus known that would enable applicant to maintain a sitting posture over any considerable period of time. There is no conflict in the evidence. It is all to the same effect.

The rule is well settled, both by statute and decisions of this court, that we will not disturb the finding of the commission, unless arbitrary, if there is any competent evidence to support it. In this case we must, however, set aside the finding of the commission because there is not one scintilla of evidence to support such finding. It is arbitrary and founded upon a misapplication of the law. The ruling of the commission, by two members, against applicant recognizes the fact that his disability is such that he is totally disabled. In finding No. V, they say:

"At the present time applicant has a permanent disability in his right leg and hip to such an extent as to make such leg practically useless from an industrial standpoint. * * * Also as a result of said accidental injury the applicant's left leg is partially disabled because of a condition of thrombophlebitis. * * * this condition causes the

left leg to become temporarily totally disabled after a short period of use and exertion from manual labor."

The record shows that after a period of use of from two hours to one-half day, the period of total disability is from four months to eighteen months. And in finding VI, they say:

"Applicant is in need of medical treatment at this time to *lessen the frequency* and *reduce the severity* of the *acute* attacks of thrombo-phlebitis, which attacks render him temporarily totally disabled when they occur. [From four to eighteen months after from 2 hours to one-half day of use.] Such treatment is also *required* to prevent a possible condition of permanent total disability from developing." (Italics added.)

The treatment suggested would practically hospitalize the applicant for twelve to eighteen months, and the doctors expressed grave doubt that it would in any way improve conditions. If it did not, then the finding indicates that the condition of permanent total disability was certain.

The record is conclusive and uncontradicted that his disability is permanent. Is it, as a matter of law, total? Total disability does not mean a state of absolute helplessness. In *Caillet* v. *Industrial Comm.*, 90 Utah 8, 58 P. 2d 760, Mr. Justice Wolfe in his dissenting opinion defined "total disability" as follows (page 763):

"It does not mean total loss of bodily function. If so, a man would have to be hopelessly paralyzed. It does not mean such disability which would prevent any person from doing any work. If that were so, it would mean loss of mind. * * * It means disablement of the particular applicant to earn wages in the type of work * * * he was trained for or any other type of work which a person of his mentality and attainments could do."

And, as held by Mr. Chief Justice Hansen in the same case, that the nature of the injury sustained by applicant is such as to make him permanently and totally disabled from doing any work requiring him to walk, to stand, or to sit, cannot reasonably be doubted. Not only does his physical

condition demand such a finding, but the expert testimony is all to that effect. And, in the words of the Chief Justice (page 762),

"The evidence in this case having conclusively shown that the plaintiff is permanently and totally disabled from either securing or performing work of the general character" (which his mentality and training would permit him to perform) "he by such evidence established a prima facie case, and in the absence of any showing that he is able to secure and perform work of a special nature, * * * he is, as a matter of law, entitled to an award as and for permanent total disability."

No evidence was offered or received by the commission which showed or tended to show that there is any work which applicant can do lying upon his back; the only position in which he can work at all. The evidence is all to the contrary. The record shows the condition of applicant to be as helpless and about as hopeless as Caillet (*Caillet* v. *Industrial Comm.*, supra) ; as Mijat (*Standard Coal Co.* v. *Industrial Comm.*, 91 Utah 549, 65 P. 2d 640) ; as Pappas, (*Carbon Fuel Co.* v. *Industrial Comm.*, 92 Utah 410, 68 P. 2d 894) ; and in two of which it was held by the commission, and in the others by this court, that the employee was totally and permanently disabled.

The order of the commission denying an award is vacated and set aside, and the cause remanded to the commission to take further proceedings in accordance with the views herein expressed. Costs to plaintiff.

HANSON and MOFFAT, JJ., concur.

WOLFE, Justice (dissenting)

Again I must with reluctance dissent. This is a case which touches one's sympathies. I suspect that may have had its influence on the writer of the prevailing opinion. The decision of the Industrial Commission is not arbitrary or unreasonable. There is ample evidence to sustain the majority opinion of the commission. I shall briefly review it. Dr.

Steele Bailey testified, "that he [Thomas] could do a certain amount of work; I don't know how heavy it would be." He testified that the right and left limb were each 50 per cent disabled. He could not carry on ordinary occupations. His employment would be greatly restricted. He "would be perfectly all right" for anything where he "could sit down and simply use his hands." He was all right from the waist up, but he cannot do any work which requires the use of his legs. Such will bring on the phlebitis. Certainly, from that testimony it cannot be concluded as a matter of law that appellant is totally permanently disabled. To do so would be to hold that a 50 per cent disability in each leg was equivalent to what the statute made in law a total permanent disability, to wit, loss of or loss of use of the whole of both legs.

Dr. Root was of the opinion that he was "totally and permanently *disabled so far as the use of the right leg is concerned.*" (Italics added.) He further testified:

"Q. How does that interfere with the rest of his body? A. With what?

"Q. With the rest of his body? A. He may be perfectly well in other respects with the exception of any deformity or any injured parts as it might have a little deterring effect on other parts of the body."

He would not be able to maintain a sitting position over a period of hours. But many kinds of work permit of change of position. The applicant can walk, although with difficulty. He walked into the room to the hearing. There is ample testimony that if he has to do heavy manual work, such as mining or digging pipe lines, the phlebitis returns and it takes a long time for it to heal. Witnesses testified that when he attempted that he was forced to quit. But, granted that he is entirely excluded from doing heavy manual work or remaining on his legs for any length of time, if there are other tasks not requiring that, which he could do, and which would be within the purview of his abilities, he would not be totally permanently disabled in law.

Dr. Root would not testify to the percentage of functional efficiency of the right leg, but from his testimony we may gather that he considered it useless. As to the left leg, he thought he had "a perfectly good leg with the exception of that phlebitis, or the loss of the valves in the veins, so that when he stands up blood fills right in and causes swelling and pain." He testified as to the left leg, "I think he is better than 50 per cent because with a little bit of care he could use that leg as well as he ever did."

Dr. Lindem testified: "The right leg is functionally of very little value." "The left leg is perfectly well except an acute and sub-acute thrombo-phlebitis." "When the phlebitis is quiescent it is perfectly normal." With the phlebitis, "it is better than 50 per cent." He further testified:

"Q. He would be able to do some physical work with the limbs as they are would he not? A. Oh, yes. He was able to come to this room, and could probably do some work around the house. He is well muscled. He is walking today. But in an industrial sense we would interpret it whether a man is able to work at a gainful occupation and whether he would be employed. Many men who have no greater disability than this man are working at an occupation right now at full wage, but I don't think he would be accepted under the present condition."

He did not think he could work at anything which would "require active use of the lower limbs."

Dr. Allen testified that the right leg was about 20 per cent as compared to a normal limb. The left limb was 75 per cent normal. He did not think that an active use of the left leg would have a tendency to accelerate the phlebitis. He did not think he could do any work which would require "sustained effort" on the part of both limbs. I think this, gives the gist of all the material testimony, and in fact all the testimony except that of plaintiff. He testified that he had tried to work in a mine helping a leaser, and that it caused him to stay in bed two weeks. After that he attempted to work digging a ditch when the phlebitis flared up. He tried selling and sorting apples, but the position hurt him

so he could not endure it. He testified that as soon as he stood on his left leg ulcers broke out, and that the first time it happened it took a year and a half to get over it. The second time it took two and one-half months with a treatment every day. In the light of all this testimony, I cannot see that a case of permanent total disability has been made out as a matter of law.

The language of *Caillet* v. *Industrial Comm.*, 90 Utah 8, 58 P. 2d 760, quoted by the prevailing opinion, was so broad as to take in cases of the loss of a hand. In such case an employee might show that he was unable without a hand to do work of the general character he had been doing, and this made out a prima facie case. And if the other side could not show that he could *secure and perform* work of a special nature, he would be as a matter of law, under that rule, permanently and totally disabled. The rule was too narrow and too wide. It was too narrow in that it made the prima facie test in law of permanent and total disability purely the question of whether he could perform work of the general character that he had been performing when injured. It did not add the phrase, "or any other work which a man of his mentality or attainments might do." It was too wide in that it brought in the economic situation as a factor in overcoming the prima facie case. It might be impossible in a depression to obtain work of a special nature or any kind of work for a fully able man, whilst in war times, when every available man is utilizable, any number of cripples could obtain jobs. This would mean that the prima facie case would be met successfully only accordingly to the varying economic situations. The statute never contemplated such a thing.

In *Babick* v. *Industrial Comm.*, 91 Utah 581, 65 P. 2d 1133, we attempted to restrict the rule to very few cases. And at the same time we again affirmed the well-known rule that if there was any substantial evidence to support the commission we would not, in fact we could not, disturb its finding. We have been see-sawing back and forth in regard to

permanent total disability throughout a number of cases until it must be most difficult for a member of the bar to know what the rule really is. The test which one should be able to apply in order to determine whether he should or should not seek certiorari is: Is there any competent evidence to support the finding of the commission? Instead of that rule, the only rule the members of the bar can now apply is: Can I convince three members of the Supreme Court that the commission on the evidence should have gone the other way? This, of course, means that we substitute our conclusions on questions of fact over those of the commission in cases where there is substantial evidence to support its findings. It means that we step outside of the very province which was assigned to us by the Legislature in the review of cases from the Industrial Commission. We said in the case of *Norris* v. *Industrial Comm.*, 90 Utah 256, 61 P. 2d 413, that the Legislature has in effect said (page 415):

"The Commission is the final arbiter of the facts. If there is error in judgment or conclusions of or from facts, it must be the Commission's error and remain there. We give the Supreme Court the right to speak only by warrant of law in compensation cases when it speaks in reference to errors of law alleged to have been made by the Commission."

I think we should definitely state whether we will abide by what I conceive to be the true rule and decide only if the commission had evidence to support its finding or lay down a rule that in each case we will ourselves determine whether we think the commission came to the correct conclusion. In the latter case, we would go against the express language of the statute, but at least it would have the merit of uniformity. The cases involving the question of whether there is total and permanent disability differ in nowise from cases involving other types of disability. The same rule applies, i. e., whether there is evidence to support the commission's findings. In this case there is ample evidence. Had the commission decided this were a case of total permanent disability, we should by the same token uphold such finding.

We might have been better pleased had it done so. But we are not the judges. The decision of the commission should be affirmed.

FOLLAND, Chief Justice (dissenting).

I concur in the views expressed by WOLFE, J., in his dissenting opinion.