· JOHN HALL ELLIOTT, APPELLANT, V. GOOCH FEED MILL COMPANY, A CORPORATION, APPELLEE.

23 N. W. 2d 262

Filed May 31, 1946. No. 32064.

*Davis & Vogeltanz* and *O. B. Clark,* for appellant.

*Baylor, Bloss & Evnen* and *Davis, Stubbs & Healey,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

PAINE, J.

This is a workmen's compensation case. After an accident at the defendant's feed mill, plaintiff was paid compensation for a period of 16 3/7 weeks at $15 a week. Thereafter he filed a petition in the compensation court, alleging that he had not recovered from said injury and praying that he be given such relief as he was entitled to under the provisions of the compensation law. Hearing was had thereon before one member of the compensation court, and the petition was dismissed. Plaintiff filed a waiver of rehearing before the full court, and appealed to the district court, where a trial was had, and plaintiff's petition was dismissed. Plaintiff appealed to this court.

The plaintiff charges in his brief that "The findings of fact upon which the decree rests are not only unsupported by the evidence but are directly contrary to and inconsistent with the overwhelming weight of the evidence." § 48-185, R. S. 1943.

The facts of this case, as supported generally by the evidence, are as follows: The plaintiff was 66 years old at the time of the accident, and was in excellent health, and had not consulted a doctor for years. He began working for the defendant, Gooch Feed Mill Company, in Lincoln as a laborer on April 7, 1943, and continued until the accident occurred on November 12, 1943. While the plaintiff was at work loading sacks on an automatic elevator, some undisclosed person on one of the other eight floors pulled the

cable, in response to which the elevator started, the gate falling upon his neck and shoulders, perhaps knocking him momentarily unconscious. His legs were caught between the floor of the elevator and the second floor of the building. In his left leg one of the bones was fractured about six inches above the ankle, and his right leg was crushed between the knee and the hip, but the femur was not fractured. He was taken home by foreman Graham, who telephoned to Dr. Carveth who handled the company business, and had him taken to St. Elizabeth Hospital, and X-rays were taken, and the fracture properly reduced, and the left leg placed in a cast. Plaintiff's wife had been at Arcadia, taking care of her sick daughter, and did not return to Lincoln until after he was brought back from the hospital.

An elderly retired graduate nurse, Miss Madge Cadman, who had for ten years been head of the General Hospital at McCook, lived in the same apartment house and assisted in caring for the plaintiff. She testified that the right leg had turned purple and blue when they first brought him from the mill, and that he could not move the toes on the right foot, and that he complained of pain in his back and shoulders but, more of pain in his right leg.

This nurse testified that she examined this right leg from time to time after he returned from the hospital, and that a sac developed and hung down, and had about a quart of fluid in it before it was drained the first time, and that it was drained about three times after he started to work, and there was a lot of pain in that leg.

Dr. Carveth testified that a large hematoma developed on the posterior lateral side of his right thigh, and on December 31, 1944, Dr. Carveth tapped this hematoma and drained out about a quart of light-colored fluid, which he testified was almost orange in color, with a red tinge, and that this serous fluid was not as thick as pus. He said this cavity had a tendency to refill, and they had to drain it off. The plaintiff testified that it was drained off many times, and that a gallon of fluid was removed altogether.

The plaintiff was told by the company doctor that he could go back to work at the mill on March 6, 1944, but he was only able to work about two weeks at that time, when he had to return home, and again went back to work a week later, and worked a few days more. He tried a third time to work, but fainted away while at work and was taken home, and never went back to the Gooch Feed Mill to work.

The plaintiff's wife testified that after her husband went back to work on March 6 they drained off more fluid from time to time. He would work a few days and then lay off a few days. The first two spells he had violent headaches. The third spell he fainted at the mill, had a violent chill and a high temperature. She called Dr. Carveth, and he said, "That sounds like flu." She said to him, " 'Doctor, that is not flu, it is the result of accident, I wish you would come and see him. We need a doctor badly.' He says, 'No, I can't come, I am sure it is not connected with the accident.' " The witness testified that she could see no improvement in his condition, that his legs have bothered him ever since, also his back and shoulders; he is restless at night, "moans and twitches and turns"; he never had headache spells or inability to sleep nights before the accident.

After he quit work, Miss Madge Cadman, the nurse, telephoned Dr. Carveth a couple of times to come out and look at him, and she testified: "Mrs. Elliott called him and I thought I would try so I called him and then I called him a second time and asked if he couldn't come in the evening just a few minutes and maybe he might help him. And he said, 'I don't think this pertains to his accident at all and I just couldn't come and I wish Mrs. Elliott would call the family physician'. And I said, 'He lives at Loup City, it would be impossible to get him'. And Dr. Carveth says, "Well, I couldn't come.' "

He finally quit work early in May, and later in the same month went to Arcadia, where his daughter lived. He suffered from shortness of breath, chills, attacks of dizziness, headaches, nausea, bodily aches, and general weakness.

In May and June plaintiff was taken to Dr. Carl G. Amick at Loup City three or four times for examination. He took no X-rays. He said plaintiff had perfect alignment of his broken bone. His blood pressure was around 135 systolic and 90 diastolic. He found some condition of hardening of the arteries.

Dr. Amick further testified: "It is a well known fact that following trauma, especially severe trauma, such as occurs in the type of accident that this man had, that there is considerable shock to the nervous system. The older an individual is, the more susceptable his nervous system is to such shock. I do not question but that a fall down an elevator shaft resulting in a broken leg and other severe injuries would cause enough shock to this man's nervous system to produce all symptoms of which he complained."

Dr. V. S. Barkey testified for plaintiff in the district court that the X-rays showed some enlargement of the heart, but no organic difficulty; that the heart is of the athletic type, common in men of his age who have worked hard all their lives; that the heart condition would not incapacitate him from labor; that he does not have hypertension for a man of his age. He testified that the serious accident, with a fractured bone, body bruises and fright, would cause him to have a general break in his health. He testified that, where you have a ruptured blood vessel where the serous fluid drains out, it causes pain, and then probably a new circulation is established through collateral blood vessels.

Plaintiff returned to Lincoln for the trial in the compensation court, which was held September 15, 1944, and thereafter started working for Gold & Co., where he cut up meat for hamburger and sausage and filled egg cases from eggs in bulk. In the bill of exceptions appears exhibit A, being the application blank which plaintiff filled out on October 7, 1944, to secure employment at Gold & Co. In this application he gave as the reason for leaving the Gooch Feed Mill job that he was slightly hurt in the elevator. This Gold & Co. record on the plaintiff shows that he left work on March 27, 1945, to reduce the force, that

his record was good, and that he was slow but dependable.

Later in March 1945, plaintiff found work at the Patriot Body Company, nailing up ammunition boxes, for which he was paid 70 cents an hour. Plaintiff quit this work April 10 because he was unable to do it; his leg ached, and his back and shoulders hurt him.

From this very brief synopsis of the evidence as found in the bill of exceptions, it appears that plaintiff suffered a very severe accident, injury and shock in being caught in the elevator at the Gooch plant, and that, being an elderly man and needing the work badly, he followed the doctor's instructions and went to work on March 6, 1944, before he had recovered from the effects of his accident. The hematoma in his right leg continued to pain him, and had to be drained either three or four times after his return to work.

There is competent evidence that the pain in his legs, shoulders, and back have continued ever since the accident. The fact that he tried to work several times, but could not hold up and had to stop working, and that the last time he worked at the mill he got sick, lost consciousness, was dizzy, vomited, and had terrible chills shows that he had not recovered from his accident. When Dr. Carveth refused to treat him longer, plaintiff and his wife went to stay with their daughter at Arcadia. He was unable to do any work except a little light work in the garden. The job that he got at Gold & Co. was a very light job of trimming meat for hamburger and sausage. They gave him permission to sit on a table, first on one hip and then on the other. When the meat gave out, he put eggs in small cartons of twelve eggs, and could sit down all the time he was doing it. Each of these jobs required only a little effort with his hands, as other men did all the lifting of the meat. He was also permitted to rest an hour at a time, while his pay went on.

While the superintendent at the Patriot Body Company did not appear to know it, during the few days the plaintiff worked out there, he testified, he sat down on the table part of the time, and part of the time he stood, or leaned on the

table, but he was unable to do the work and quit, for his legs ached, his back hurt, and his shoulders hurt. This court cannot overlook the fact, which is proved by the evidence, that plaintiff did his best to go to work when the company doctor directed, although he was still weak and suffering from the effects of his accident. Under such conditions, a workman should not be penalized who does his very best to go back to his job too quickly following an injury, and should not be denied compensation because he made an honest effort to go to work. Such a holding would tend to destroy the initiative of a workman after an accident. All injured employees should go back to work as soon as they can, but if the symptoms of the original injury reoccur, as they did in this case, he should not be denied compensation for trying to work.

It is provided in section 48-181, R. S. Supp., 1945, that where a rehearing has been waived before the Nebraska Workmen's Compensation Court and an appeal taken to the district court, the trial in the district court shall be a trial de novo, and all findings, orders, awards, and judgments of said court shall be conclusive upon all parties in issue, unless reversed or modified.

As we consider this case de novo, we find that the prayer of plaintiff in his original petition before the workmen's compensation court, and also before the district court, asked that plaintiff be adjudged to have all of the relief that he may be entitled to under the provisions of the workmen's compensation law of Nebraska and acts amendatory thereto, and for such other and further relief as may be just and equitable.

Now, it appears to this court that the evidence shows that plaintiff has made several honest efforts to find and hold down jobs which before the accident he would have been able to fill, but he was unable to do the work by reason of pain and weakness in his legs, back, and shoulders as a result of his injuries at the time of his accident.

"Total disability" does not mean helplessness or complete disability, but it includes more than that which is partial.

Tieben v. United States, 7 Cir., 96 F. 2d 907.

For workmen's compensation purposes, "total disability" does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he was trained for, or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do. Thomas v. Industrial Commission of Utah, 95 Utah 32, 79 P. 2d 1; Knispel v. Gulf States Utilities Co., 174 La. 401, 141 So. 9; Moore v. Peet Bros. Mfg. Co., 99 Kan. 443, 162 P. 295.

"Thus, although a workman has a limited physical capacity to work and earn money, nevertheless a finding that he is totally 'incapacitated for work' is justified where it is based upon the further finding that the workman 'has endeavored to obtain, and has been unable to find, any work which the incapacity due to the injury will not prevent him from performing.' Duprey's Case (1914) 219 Mass. 189, 106 N. E. 686." Annotation, L. R. A. 1916A, 380.

"A workman, who, solely because of his injury, is unable to perform or to obtain any substantial amount of labor, either in his particular line of work, or in any other for which he would be fitted except for the injury, is totally disabled within the meaning of the workmen's compensation law." Wingate v. Evans Model Laundry, 123 Neb. 844, 244 N. W. 635.

In a very recent case this court said: "Total disability contemplates the loss of earning power and in measuring such loss consideration will be given to the ability to earn wages, eligibility to procure employment generally, ability to hold a job obtained, and the capacity to perform the tasks of the work in which a person is engaged." Evans v. City of Lincoln, *ante* p. 163, 22 N. W. 2d 565. Now, while this was in a pension case, we still believe that the statement of law is applicable to a compensation case.

The plaintiff in the case at bar is an unskilled, or common, laborer. It has been shown that he can only work, if at all, at the lightest kind of common labor, such as sitting

down, with no heavy lifting. He is, therefore, what is called an "odd lot" man, the nondescript in the labor market, with which industry has little patience, and rarely hires. Work, if he finds any that he can do, is casual and intermittent. He is utterly unable to do the work he did before this accident. Under these facts, we think we are justified in finding that in his present handicapped condition he is entitled to an award for total disability under the Nebraska Compensation Act.

Insofar as the costs in the instant case are concerned, section 48-187, R. S. 1943, provides that no filing fee is required in compensation cases.

In regard to the cost of the bill of exceptions of 229 pages, which the plaintiff had to secure, this court, in passing upon a motion to retax costs in 1904, said: "We think that costs of settling the bill of exceptions are costs made in the district court, and should be taxed as such against the unsuccessful party in the final determination of the litigation." Pettis v. Green River Asphalt Co., 71 Neb. 519, 101 N. W. 333. After discussing this same case, this court, in another opinion entered on retaxing costs, directed the district court to cut down the amount which had been allowed in that court for a bill of exceptions and to allow only the amount of fees as provided by the statute. Barton v. Barton, 126 Neb. 846, 254 N. W. 566.

In Lee v. Lincoln Cleaning & Dye Works, 145 Neb. 124, 15 N. W. 2d 330, it was held that, when an employee appeals from a decision of the district court which denied an award, and this court reverses the district court and holds that the employee is entitled to compensation, the cause will be remanded with instructions to enter an award for plaintiff in accordance with the opinion. However, this court is not authorized to allow an attorney's fee in such a case, under section 48-125, R. S. 1943. See Redfern v. Safeway Stores, Inc., 145 Neb. 288, 16 N. W. 2d 196; Schirmer v. Cedar County Farmers Telephone Co., 139 Neb. 182, 296 N. W. 875; Wilson v. Brown-McDonald Co., 134 Neb. 211, 278 N. W. 254, 116 A. L. R. 702.

Therefore, the plaintiff cannot be allowed any attorney's fees, under section 48-125, R. S. 1943, but all other costs taxed in this court, including the cost of the transcript and printing briefs, will follow this judgment.

This court finds that the trial court was in error in denying plaintiff any compensation, and we find that the plaintiff is entitled to an award for total disability, as provided in paragraph (1) of section 48-121, R. S. 1943, proper credit to be given for compensation payments heretofore voluntarily made.

The cause is reversed and remanded, with instructions to the district court to enter judgment in accordance herewith, including in the costs allowed plaintiff the sum of $81.55 paid by plaintiff on December 3, 1945, for the bill of exceptions.

REVERSED AND REMANDED.