CLIFFORD WHEELER, APPELLANT AND CROSS-APPELLEE, V.
NORTHWESTERN METAL COMPANY, APPELLEE AND
CROSS-APPELLANT.
124 N. W. 2d 377

Filed November 15, 1963. No. 35480.

Norman Langemach and Kier, Cobb & Luedtke, for appellant.

Cline, Williams, Wright, Johnson, Oldfather & Thompson and Charles E. Wright, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action arising under the provisions of the Nebraska Workmen's Compensation Act. The case was tried before one of the judges of the Nebraska Workmen's Compensation Court who rendered an award finding, insofar as necessary to consider here, that at the time of the plaintiff's accidents and injuries he was receiving an average weekly wage of $62, being sufficient to entitle him to benefits in the amount of $37 a week from and after February 26, 1962, for so long as his total disability remained, not to exceed 300 weeks; that if the plaintiff's total disability continued beyond the period of 300 weeks then, from and after such period of 300 weeks, he was entitled to compensation from the defendant at the rate of $27.50 a week so long thereafter as he remained totally disabled for the remainder of his life; and that if prior to 300 weeks the plaintiff's total disability ceased, he would be entitled to statutory amounts of compensation for any residual permanent partial disability due to the accidents and injuries involved. The award further provided that the defendant pay the medical and hospitalization expenses. Thereafter the defendant filed, in the Workmen's Compensation Court, a waiver of rehearing and notice of appeal, and subsequently filed a peti-

tion on appeal in the district court for Lancaster County. The plaintiff filed an answer to the defendant's petition on appeal. The defendant filed a reply to the plaintiff's answer in the form of a general denial. The district court found that the award of the Nebraska Workmen's Compensation Court should be set aside and vacated; that the plaintiff sustained a 35 percent permanent partial disability; that the defendant should pay the medical expenses of the plaintiff resulting from his accident and loss of earning power to his body as a whole as a result of an injury received by the plaintiff on February 22, 1962; and that the plaintiff was not entitled to any penalty nor the allowance of attorney's fees. The award further vacated and set aside the award entered by the Nebraska Workmen's Compensation Court, and allowed the plaintiff benefits in the amount of $1,205.16 as compensation for temporary total disability for the period from February 26, 1962, until October 12, 1962; that the plaintiff recover from the defendant for permanent partial disability $14.47 a week from October 12, 1962, to the time of trial and thereafter and in addition thereto the sum of $14.47 a week so long as the plaintiff should live, not, however, to exceed 267 3/7 weeks from and after October 12, 1962; and that the defendant pay for and on behalf of the plaintiff the designated medical expense and hospital expenses which need not be set forth.

The plaintiff's petition, filed in the Nebraska Workmen's Compensation Court, alleged injuries arising out of and in the course of his employment on October 27, 1961, February 14, 1962, and February 22, 1962; that he was employed as a laborer receiving wages of about $75 a week; that the nature and extent of his injury was a crushing of two vertebrae in his back; that the defendant had notice of such injury on October 27, 1961, and on February 26, 1962; that he had been totally disabled since February 22, 1962, and had been hospitalized for over 30 days commencing March 3, 1962, and was under constant medical attention; and that the defend-

ant failed and refused to pay any benefits to the plaintiff under the Nebraska Workmen's Compensation Act. The petition further alleged that on February 14, and February 22, 1962, the plaintiff fell from a ladder a distance of 5 feet, and from and after February 22, 1962, he had been totally disabled.

The defendant's answer admitted that the plaintiff was employed by the defendant on the dates specified; denied that the plaintiff suffered an accident arising out of and in the course of his employment on the dates specified; alleged that any disability the plaintiff suffered was the result of causes congenital or otherwise and in no way caused by his employment; and denied all other allegations of the plaintiff's petition not admitted in the defendant's answer.

The defendant filed its petition in the district court alleging that the Nebraska Workmen's Compensation Court erred in finding that the plaintiff sustained injuries arising out of and in the course of his employment by the defendant on the dates specified; in finding that the plaintiff was totally disabled; and in allowing plaintiff benefits under the Nebraska Workmen's Compensation Act. The prayer was for dismissal of the plaintiff's alleged cause of action.

The plaintiff's answer to the defendant's petition on appeal alleged that the award of the Nebraska Workmen's Compensation Court was correct and that the plaintiff was entitled to penalties and attorney's fees by reason of the unreasonableness of the defendant in withholding benefits due the plaintiff after demands made upon the defendant for payments of such benefits under the Nebraska Workmen's Compensation Act.

The defendant, in reply to the plaintiff's answer on appeal, denied all allegations contained therein save those as were consistent with the defendant's petition on appeal.

The principal assignments of error are as follows: That the district court erred in finding that the plaintiff

sustained a 35 percent permanent partial disability for the period following October 12, 1962, instead of finding that the plaintiff was entitled to permanent total disability; that the district court erred in finding that the plaintiff was not entitled to any penalty payments; and that the judgment is contrary to the evidence and the law.

We deem the following authorities pertinent to a determination of this appeal.

Section 48-151, R. R. S. 1943, provides in part: "The word accident as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." See, also, Mook v. City of Lincoln, 143 Neb. 254, 9 N. W. 2d 184; Tilghman v. Mills, 169 Neb. 665, 100 N. W. 2d 739.

In an action under the Workmen's Compensation Act the burden is on the claimant to establish by a preponderance of the evidence that he sustained a personal injury by an accident arising out of and in the course of his employment. See Pittenger v. Safeway Stores, Inc., 166 Neb. 858, 91 N. W. 2d 31.

Such facts must be proved by the claimant by sufficient evidence leading to the direct conclusion, or by a legitimate legal inference therefrom, that such an accidental injury occurred and caused the disability. There must be shown a causal connection between an accident suffered by the claimant and the cause of his disability. Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51.

The applicable rule of construction of the Workmen's Compensation Act is that it be liberally construed to the end that its beneficent purposes may not be thwarted by technical refinement of interpretation. Haler v. Gering Bean Co., 163 Neb. 748, 81 N. W. 2d 152.

In considering the sufficiency of the proof, the rule

of liberal construction, as it relates to the Workmen's Compensation Act, applies to the law and not to the evidence offered to support a claim by virtue of the law. Anderson v. Cowger, *supra*.

On an appeal to this court in a workmen's compensation case the cause will be considered de novo upon the record before us. Anderson v. Cowger, *supra*.

With the foregoing authorities in mind, we come to a summary of the evidence.

For convenience we will refer to the parties as they were designated in the district court.

The plaintiff testified that he was 57 years of age and could neither read nor write, not having completed the third grade. He had not learned a special trade of any type. His employment record is one of heavy type of labor, that is, mining and construction labor including moving concrete. It appears from the record that in the summer of 1959, in McDermitt, Nevada, the plaintiff, while engaged in mining, was hit on the small of the back by a falling rock. He was treated by Dr. Rueckl of Winnemucca, Nevada, and later hospitalized and subjected to surgery in February 1960. After 3 or 4 months, he was released from further medical care to return to heavy lifting and labor. On cross-examination the plaintiff testified that after he was released he did not return to work at the mine in McDermitt for the reason that he was not permitted to go back to heavy work. On June 27, 1960, the plaintiff entered into a settlement agreement with the Nevada Industrial Commission whereunder he received an award of $1,500, based upon a 10 percent permanent partial disability on a body basis, and a 5 percent permanent partial disability for other considerations. This settlement agreement places the date of the injury as July 2, 1959.

Dr. Rueckl saw the plaintiff off and on until August 24, 1959, at which time the plaintiff complained of pain in the lower back. The only positive finding at the time was tenderness and spasm bilaterally in the lower

back area. The plaintiff was hospitalized immediately
and placed in pelvic traction until August 31, 1959. The
plaintiff returned on September 2, 1959, with back spasm
and pain and was readmitted to the hospital where a
body cast was applied and left on for 4 to 6 weeks. The
plaintiff showed some improvement and returned to
work on September 28, 1959. Certain exhibits were re-
ceived in evidence. These exhibits were X-ray pictures
which were explained by Dr. Rueckl, with the conclu-
sion that the amount of reaction that was evident in
the lower dorsal and upper lumbar vertebrae could be
sufficient to give the plaintiff back symptoms; and that
there was spasm in the lumbar muscle which involved
pain from the lower dorsal vertebra all the way down
to the first sacral vertebra. The doctor felt that the
cause of the plaintiff's difficulties was the changes that
were evident in the X-rays of his upper lumbar region,
being the hypertrophic bone and the narrowing of the
disc interspaces, which are found in a person who has
performed a lot of traumas on his back and who has
worked hard most of his life. On October 31, 1959, Dr.
Rueckl gave as his opinion that the plaintiff would prob-
ably be an individual who would have recurrent dis-
comforts with his back irrespective of the employment
he followed. It was his opinion that the plaintiff would
be a chronic back complainer; that he had justifiable
grounds for the complaints referable to his back; and
that the least amount of overindulgence in work or back
motion could precipitate a problem in connection with
his back in the way of muscle spasms and discomfort.
At the time he saw the plaintiff on June 24, 1960, the
plaintiff had between 10 and 15 percent partial disability
which was permanent. On cross-examination this doc-
tor stated that in June 1960, if the plaintiff had chosen
to work at his previous mining job he would have found
the physical strength to do it.

In response to the plaintiff's cross-interrogatories, Dr.
Rueckl stated that the plaintiff's subjective complaints

and the objective findings, which were free of neurological involvements, were compatible with his basic condition which was hypotrophic arthritis; and that the plaintiff made a good, uneventful recovery from the effects of the surgery.

The plaintiff was referred to Doctors Rosenauer and Mack. Dr. Rosenauer testified that he specialized in the practice of neurological surgery; and that he performed a lumbar myelogram on the plaintiff on December 29, 1959. The plaintiff complained of pain in the lower back and at times in the left hip and leg. There was marked muscle spasm in the low back on the right side, complaints of tenderness on the left side, and a 15 degree limitation in straight leg raising on the left side. He next saw the plaintiff on February 17, 1960, at which time the plaintiff continued to have pain in his low back and left hip and was unable to work. There was pressure tenderness in the low left lumbar region and pain on straight leg raising but no definite location at which the pain became unbearable. On February 26, 1960, this doctor operated on the plaintiff, performing a partial laminectomy. The plaintiff's condition became stationary following the operation, and there were no specific complaints apart from occasional discomfort in the low back. The plaintiff desired to return to work and was advised to wait 1 month before starting. On cross-examination this doctor stated that he thought the plaintiff could return to work at heavy duty labor with 1 month's lay-off.

Dr. Mack, a former associate of Dr. Rosenauer, in response to certain interrogatories from the plaintiff, testified that he examined the plaintiff on June 27, 1960, and found the plaintiff to have a good range of back motion, the wound well healed from the operation, and no subjective complaints. He further found that the plaintiff should wait 2 months before undertaking any heavy work. In response to cross-interrogatories of the defendant, this doctor stated that he examined the plain-

tiff on four separate occasions from December 1959, through June 1960; that based upon the examinations that were carried out by Dr. Rosenauer and his examination of the plaintiff, it was his opinion that the plaintiff had a ruptured lumbosacral disc which difficulty did not antedate the traumatic occurrence in July 1959; that on June 27, 1960, he considered that the plaintiff had recovered from his injury and estimated his return to full duty in 2 months; and that he found osteophyte formations in the plaintiff's lumbar spine which were probably of long standing and in his opinion were caused by wear and tear in an individual who did hard work.

After the doctors released the plaintiff in Nevada, he took a job as a farmhand in Idaho, where he lifted bales of hay weighing 100 to 125 pounds, and which caused him no back trouble. He did mining work in Idaho, Oregon, and Colorado, drove a truck in Oregon and a truck and bulldozer in California, did common farm work, dug ditches, scooped gravel, and worked on a ranch. Later he returned to Nebraska where he drove a water truck on the interstate highway construction for the Abel Construction Company, helped tear down a building in Lincoln, and washed dishes at a cafe before he commenced working for the defendant in June 1961. While working for the defendant his wages were $1.55 an hour for a 40-hour week. He worked as a burner. As a burner his job involved twisting and turning, lifting 100-foot lengths of hose and gas tanks, and climbing up and down ladders carrying a torch and a hose. No complaint was made by the defendant that the plaintiff did not do his work satisfactorily. On February 14, 1962, the plaintiff was working at the defendant's yard on Tenth Street in Lincoln, taking down a fence which was made of railroad rails for posts and crossbars of old pipe. The fence was 12 feet high. He was working on the south side of the fence using a cutting torch. The fence was interlined with corrugated steel which had to be burned off where it was welded

to the pipe. The plaintiff was on a ladder 6 feet off the ground, standing on the ladder and the center crossbar of the fence. The crossbar on the fence broke and the plaintiff fell in a twisting motion onto his hips. He sat in this position for a few minutes and then returned to work. He returned to work the following day. He was stiff and sore, but continued to work several days. On February 22, 1962, while the plaintiff was doing the same type of work, he sustained a similar accident resulting in injuries. At that time he was about 6 feet above the ground cutting the upper pipe off of the fence. The pipe broke in identically the same way as it did before. There was snow on the ground. The ladder slipped off the end of the pipe. His left leg went between the rungs of the ladder. He fell onto the small of his back across the pipe, a distance of 6 feet. He was badly hurt at the time, and laid in the snow approximately 15 minutes. He was helped up by his coworker, Clarence Kinnison. From that time on, Clarence Kinnison did the cutting. The plaintiff worked the next day as much as he could, but was stiff and sore. He did not work the day after, which was Saturday. On Monday he was unable to get out of bed. The plaintiff was sent to St. Elizabeth's Hospital on March 3, 1962, by ambulance, where he was examined by Dr. Goetowski.

Clarence Kinnison testified that he was a coworker with the plaintiff and worked for the defendant; that he did not actually see the plaintiff fall on February 14, 1962; that on February 22, 1962, he observed that when the pipe broke the plaintiff fell backwards on the middle crossbar of the fence and the ladder; that the plaintiff remained on the ground about 2 minutes, then this witness assisted the plaintiff to get up; that this witness took over the cutting torch and proceeded to complete the work; and that there was about 1½ hour's work left on that day.

Dr. Goetowski, an orthopedic surgeon, testified that he examined the plaintiff on March 3, 1962, in the emer-

gency room at St. Elizabeth's Hospital, at which time the plaintiff was in severe pain and was given an opiate to relieve the pain. The plaintiff complained of pain in his low back and was unable to lift his left leg. There was weakness in his left foot. Even after the opiate was administered, the plaintiff was in such pain that the doctor could not turn him over, but had to examine him by feeling underneath him. The plaintiff's reflexes were tested and he failed to react, which indicated an interruption of the normal neurological pathway. After the examination the plaintiff was given heavy doses of opiates and muscle relaxants in an effort to control his acute muscle spasms and pain. The plaintiff was put in pelvic traction aggregating 30 to 40 pounds of traction, while the normal traction is 20 to 25 pounds. The plaintiff was hospitalized from March 3, 1962, until March 30, 1962. When he left the hospital he was required to wear a brace. This doctor further testified that there were arthritic changes in the plaintiff's spine which were revealed by X-rays. This doctor further testified that it was his experience that many people with such a condition as the plaintiff had might carry on for an indefinite period of time until some unusual or sudden force projects itself and at once it becomes symptomatic. In his opinion the plaintiff's back condition was the result of the accident, plus a preexisting condition. The detailed findings of this doctor as late as October 12, 1962, indicated severe restriction of motion, muscle spasm, objective neurological findings of depressed sensation, left knee and ankle jerk absent, and right ankle jerk absent. This doctor testified that the plaintiff had a 25 to 35 percent permanent partial disability of the body, and in his opinion the plaintiff would continue to suffer pain in the future by reason of the aggravation of the preexisting condition.

On cross-examination this doctor testified that the plaintiff would be able to operate an elevator, and he could work as a doorman at a hotel, provided he had

periods of rest; that he would not be able to work as a busboy in a restaurant due to having to carry heavy trays and other types of work connected therewith; that gardening would be a problem for the plaintiff because he would have to hoe and dig, and the doctor did not encourage that; and that the plaintiff could not do work requiring walking up and down steps. The doctor further testified that even if the plaintiff's present subjective complaints would subside completely, he would not certify the plaintiff back to heavy labor. On redirect examination this doctor testified that the plaintiff could not operate heavy equipment; and that in his opinion, because of the combination of the preexisting factors plus the plaintiff's trauma, he has a complex aggravation which will persist and remain in the future.

Dr. Goetowski suspected that the plaintiff had an ulcer and asked Dr. Maxwell, an internist, to examine the plaintiff. Dr. Maxwell did not find anything in the course of his examination to indicate that the plaintiff was faking or malingering, or anything other than what was genuine. He testified that the plaintiff tried to minimize his particular complaints. This doctor found no evidence of heart trouble or kidney disease, nor infection of the veins or arteries of the leg, and stated that there was no indication of gout.

Dr. McGreer, a roentgenologist, a witness for the defendant, took X-rays of the plaintiff on March 3, 1962. The X-rays disclosed no fracture or dislocation, but revealed narrowing of intervening disc spaces of the lumbar spine and osteophytic lipping of numerous bodies consistent with degenerative arthritis of the lumbar spine, which is degenerative arthritic change, the exact cause of which is indeterminate and which may be the result of an old trauma as well as degenerative changes. This doctor testified on cross-examination that he could not see any evidence of the effect of trauma on any of the X-rays that he took. This doctor testified that all structures are subject to trauma.

Dr. Horn, an orthopedic surgeon, testified on behalf of the defendant that he examined the plaintiff on September 24, 1962, at the request of the defendant. The plaintiff gave the doctor a history of two falls from a ladder in February 1962. He further testified that the plaintiff complained of a recent attack of pain which was constant. This doctor's physical examination revealed that the plaintiff reacted as if tender all over the lumbar and lower dorsal area, however, he was able to sit up sharply when his hip was rotated; and that rotation of the hips was painful and there was no hypalgesia noted in the lower extremities. The plaintiff stood straight without list or lordosis. When asked to bend forward he did so very slowly. With urging he was able to bend quite a way down. Palpation of the hips produced considerable grimacing. There was no atrophy of his calves; and his knee jerks were brisk and active but there were no ankle jerks. The plaintiff walked freely and briskly as he left the clinic building. This witness did not see any significant changes in the X-rays taken in September 1962, and the ones taken in November 1961. This doctor testified that the plaintiff had 5 or 10 percent residual permanent disability after the disc surgery. The doctor concluded that the plaintiff was malingering. This doctor further testified that the plaintiff could return to heavy labor and various other jobs; and that the plaintiff would be able to undertake janitorial or custodial work, dishwashing, driving a truck, would be able to change a truck tire or operate a truck jack, or would be able to do work in a filling station.

On cross-examination Dr. Horn testified that an osteoarthitic process could produce considerable pain; that a trauma such as a fall could aggravate osteoarthritis and probably does in many cases; that the fact that there was no X-ray change in this particular arthritis did not necessarily mean that it was not aggravated; and that occasionally, in cases such as that of the plaintiff where there is osteoarthritis and lipping which has

been present for a period of years and a person suffers a trauma, he is unable to work following the trauma whereas he had been able to work before without complaint. This doctor was not acquainted with the plaintiff's condition before September 24, 1962, and did not read the hospital records. He further testified that he would not recommend that an employer hire a man with the condition of which the plaintiff complained. He formed no opinion as to whether the falling episodes aggravated the preexisting condition shown by the X-rays. He would not say that the treatment by Dr. Goetowski was not necessary, and he had no opinion as to whether or not the hospitalization was necessary. He further testified that trauma could aggravate the type of condition which the plaintiff had, and that if the plaintiff was working and doing heavy manual work daily before the second fall, it would be his opinion that the arthritis might have been aggravated by the falls. This doctor made no diagnosis of the plaintiff's condition, and he had no opinion as to whether or not the two falls aggravated the preexisting condition which the plaintiff had.

A witness connected with the employment service of the Lincoln office of the Nebraska Department of Labor, division of employment, testified that during the 6 months prior to the trial there had been job availabilities for porters and janitors, and for jobs which would not call for heavy lifting; that two or three of such jobs were available at the time of trial; that the pay scale for this type of work runs from $1 an hour up as high as $250 a month on a monthly scale; that during the month prior to trial there had been three job availabilities for elevator operators paying $1 an hour; that an elevator operator would not require the ability to read or write or do any heavy lifting, and the operator could be seated while working; that there was available at the time of trial a porter or custodial job requiring no heavy lifting, merely sweeping floors and waxing and dusting

furniture, requiring a man over 30 years of age and offering a salary of $257 a month; and that in his opinion a man 58 years of age with a third-grade education, whose doctor had advised him not to do any heavy lifting and who could not read or write, could find employment. On cross-examination this witness testified that it was harder to find work for a disabled person; and that he did not know the plaintiff's qualifications, and therefore his answers were general.

The defendant called an investigator for the Pinkerton Detective Agency who testified that he observed the plaintiff on the dates of October 9 through October 12, 1962, and on October 14, 1962. On October 9, 1962, he observed the plaintiff driving his automobile and walking around his automobile and home, and his movements appeared fluid. On October 10, 1962, he observed the plaintiff operating his automobile and bending over into the rear window of his automobile. On October 11, 1962, he observed the plaintiff walking out of his house, working on and washing his station wagon, crawling in and out of the back end of his station wagon, and leaning into the front seat area bending over the back of the front seat into the rear area with no noticeable brace or support. On October 12, 1962, he observed the plaintiff walk from his home, wipe off his automobile, walk from the house carrying a sack of garbage about 250 feet to a trash burner, walk from there approximately 300 feet to a mailbox, thereafter get in his automobile in company with his brother, and drive to the offices of the Lincoln Orthopedic Clinic, park his automobile in the parking lot, walk into the clinic, leave the clinic, enter his automobile, and drive off. Certain motion pictures were taken of the plaintiff which this witness explained and which have been observed. He further testified on cross-examination that he never observed the plaintiff pick up an object that weighed 30, 40, or 50 pounds, and had no knowledge of the plaintiff's ability to pick up as much as 50 pounds; that he

knew nothing about the plaintiff's ability to bend and stoop as a normal person does; and that he did not watch the plaintiff with fieldglasses and was unable to tell if the plaintiff was wearing a back brace from a block away with the naked eye.

We conclude that the plaintiff has established by a preponderance of the evidence that he sustained an injury by an accident arising out of and in the course of his employment.

The question arises, what was the extent of the disability the plaintiff suffered?

For workmen's compensation purposes, "total disability" does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he was trained for, or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do. See, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262; Elliott v. Gooch Feed Mill Co., 147 Neb. 612, 24 N. W. 2d 561.

"An employee may be totally disabled for all practical purposes and yet be able to obtain trivial occasional employment under rare conditions at small remuneration. The claimant's status in such respect remains unaffected thereby unless the claimant is able to get, hold, or do any substantial amount of remunerative work either in his previous occupation or any other established field of employment for which he is fitted." Sporcic v. Swift & Co., 149 Neb. 246, 30 N. W. 2d 891. See, also, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262; Crable v. Great Western Sugar Co., 166 Neb. 795, 90 N. W. 2d 805.

In Pavel v. Hughes Brothers, Inc., 167 Neb. 727, 94 N. W. 2d 492, this court held: "Disability under section 48-121, R. S. Supp., 1957 (now R. R. S. 1943), subdivisions (1) and (2), is defined by our statute in terms of employability and earning capacity rather than in terms of loss of bodily function." And, referring to Miller v.

Peterson, 165 Neb. 344, 85 N. W. 2d 700, this court said: "* * * we had occasion to examine a contention that a court should hesitate to refuse to accept the findings of the medical experts as to the extent of the disability. We held that: 'There seems to be an assumption that the ratio of functional loss, or loss from the medical viewpoint, is the same as loss of earning capacity or wage loss. If this were so it would be quite immaterial in what occupation an injured workman was engaged and to what extent he was unable to perform it or similar work because of his injury. Disability under subdivisions (1) and (2) of section 48-121, R. S. Supp., 1953, refers to loss of earning capacity and not to functional or medical loss alone.' By quotation from Castle v. City of Stillwater, 235 Minn. 502, 51 N. W. 2d 370, we approved this language: 'Thus, in defining total disability, losses in bodily function are not important in themselves, but are only important insofar as they relate to ability to earn an income.'"

The evidence discloses that the plaintiff in the instant case is an unskilled or common laborer, and discloses that he cannot engage in doing heavy lifting. He is, therefore, what is referred to as an "odd job" man, the nondescript in the labor market, with which industry has little patience, and rarely hires. Work, if he finds any that he can do, is casual and intermittent. He is unable to work as he did before this accident. Under these facts, we think we are justified in finding that in his present handicapped condition he is entitled to an award for permanent total disability under the Nebraska Workmen's Compensation Act.

The plaintiff makes reference to section 48-125, R. R. S. 1943, to the effect that in the event an employer fails to pay compensation within 30 days of notice of disability, the employee is entitled to an additional 50 percent of compensation for all delinquent payments, and attorney's fees. We have examined the evidence re-

lating to this phase of the case. The following rule is applicable.

Where a reasonable controversy exists between an employer and an employee as to the employer's liability, the employer is not liable for the penalty for waiting time or for allowance of attorney's fees. See Redfern v. Safeway Stores, Inc., 145 Neb. 288, 16 N. W. 2d 196.

The defendant cross-appealed, contending that the trial court erred in finding that the plaintiff sustained personal injuries by accidents arising out of and in the course of his employment on the dates heretofore mentioned; in allowing the plaintiff any benefits under the Nebraska Workmen's Compensation Act; and in failing to dismiss the plaintiff's petition and causes of action in accordance with the evidence and the law.

In the light of what has heretofore been said relating to the evidence and the law applicable thereto, we find that the defendant's cross-appeal is without merit and cannot be sustained.

As we view the record, the plaintiff is entitled to recover from the defendant for permanent total disability the sum of $37 a week from and after February 26, 1962, for the first 300 weeks of such disability, and the sum of $27.50 a week for the remainder of his life as provided for in section 48-121, R. R. S. 1943. In addition, the plaintiff is entitled to recover for medical expenses and hospitalization furnished the plaintiff as shown by the record.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.