Joseph L. Pavel, appellant, v. Hughes Brothers, Inc.,
A CORPORATION, APPELLEE.

94 N. W. 2d 492

Filed January 30, 1959.   No. 34502.

*McKillip, Barth & Blevins,* for appellant.

*Norval Brothers* and *Cline, Williams, Wright & Johnson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is a workmen's compensation case which plaintiff brings here for trial de novo under the established rules.

The trial court allowed compensation for temporary total disability up to March 20, 1957; it held that plaintiff had a 50 percent permanent partial disability to the body as a whole entitling him to compensation for a period of 239 weeks; it allowed certain medical expenses and denied others, and denied an attorney's fee; and it held that plaintiff's election to forego further surgery was reasonable.

On appeal here the defendant presents the contention that the original award of the compensation court was permanent and final, and subject only to a modification finding whether plaintiff's incapacity had decreased since the original award and, if so, then a determination of the extent of the disability due to the admitted accident and liability arising therefrom. We determine that contention adversely to the defendant.

Plaintiff contends here that the trial court erred in not finding that plaintiff was totally and permanently disabled; in disallowing certain medical expenses; and in disallowing the recovery of an attorney's fee.

We sustain these contentions, except as to the allowance of attorney's fee.

By the pleadings in the district court the defendant admitted the employment; the weekly wage; that plaintiff suffered an accident in the course of and arising out of the employment on January 10, 1956; and that it furnished medical and surgical services for two operations.

We take up first the contention advanced by the defendant. The transcript contains two awards of the compensation court. The first is the award of August 15, 1956. It, so far as important here, provided that if plaintiff desired surgery it should be performed within a period of 90 days from the date of the award; that defendant should pay the costs thereof; and that defendant should pay compensation at the rate of $30 per week until the plaintiff had recovered from such surgery, but in any event not to exceed the aggregate of 300 weeks. It further provided that if plaintiff should not have surgery performed within the 90-day period that then plaintiff should recover compensation at the rate of $6.37 a week, based on a 15 percent permanent partial disability for the balance of the 300 week period. In accord with section 48-141, R. R. S. 1943, it further provided that the award could be modified upon a showing of an increase or decrease of plaintiff's disability due solely to the injury.

The transcript also contains a modification of award order of the compensation court dated March 22, 1957. It recites that the matter came on for a modification of the award "on application of the defendant" filed March 2, 1957. The decree awarded the plaintiff $30 for one week temporary total disability from March 13, 1957 (the date of the hearing), and thereafter the sum of $8.49 per week for 239 weeks for a 20 percent permanent partial disability. It was further decreed that the award of August 15, 1956, was modified to conform to the award of March 22, 1957.

Defendant pleaded in the district court that it had tendered payments in accord with the modification award and at the trial offered evidence to that effect.

Defendant prayed that the award of August 15, 1956, be set aside and vacated and that it be discharged from further liability.

The appeal to the district court was under the procedure that provided for a trial de novo in that court.

Plaintiff pleaded the award of March 22, 1957, and alleged error in it. Defendant, by answer, admitted the award and pleaded that there had been a decrease of disability since the award of August 15, 1956; alleged that plaintiff was "not now" wholly disabled as a result of the accident; that plaintiff had had two separate operations for which it had paid; that plaintiff's disabilities resulted from congenital defects not related to the accident; that it had offered additional surgery which plaintiff refused; and that he had refused to follow medical advice designed to rehabilitate him.

It appears clearly then that the appeal to the district court and to this court rests essentially upon the modified award of March 22, 1957, which award rests on the application made by the defendant for a modification of the award of August 15, 1956.

The rule is: The statute, section 48-141, R. R. S. 1943, authorizing a decrease or increase on the ground of incapacity due solely to the injury, limits the basis for the modification to that increase or decrease of incapacity which is due solely and only to that violence to the physical structure of the body which resulted from the accident, and which increase or decrease has occurred since the award was rendered. Ludwickson v. Central States Electric Co., 142 Neb. 308, 6 N. W. 2d 65. See, also, Riedel v. Smith Baking Co., 150 Neb. 28, 33 N. W. 2d 287; Chadd v. Western Cas. & Sur. Co., 166 Neb. 483, 89 N. W. 2d 586.

In Chadd v. Western Cas. & Sur. Co., *supra,* we restated the rule that: "Before recovery may be had for

an increase of incapacity due solely to the injury, within the meaning of subdivision (b), section 48-141, R. R. S. 1943, the plaintiff must prove by a preponderance of the evidence that his incapacity has been increased; that is, that there now exists a material and substantial change for the worse in the plaintiff's condition—a change in circumstances that justifies a modification, distinct and different from that for which an adjudication had been previously made." That rule was in accord with the fact situation, for there the plaintiff was the applicant for modification. However, in Riedel v. Smith Baking Co., *supra,* we held: "Upon an application to modify an award under the workmen's compensation statutes, the burden of proof rests upon the petitioner to establish by a preponderance of the evidence that the disability has increased, decreased, or terminated as alleged."

As a rule, then, the statement in Chadd v. Western Cas. & Sur. Co., *supra,* should refer to the applicant for a modification. Applied here, the defendant has the burden of establishing a decrease of incapacity and the plaintiff has the burden of showing an increase of incapacity under the limitation of the above rules.

It is patent that to give effect to these rules they must be held to include a change in the original award of amounts and period of compensation payments so as to be in accord with findings, if any, of an increase or decrease of incapacity.

There being no cross-appeal here, we are concerned only with the question of whether there has been an increase in disability since the award. We limit the evidence discussion to that question.

This brings us to the evidence here.

The findings of the award of August 15, 1956, were: "That on January 10, 1956, plaintiff was in the employ of the defendant as a laborer and while so employed and on said date and while engaged in the duties of such employment sustained an injury to his back as a result

of an accident arising out of and in the course of his employment by the defendant when, while moving some wooden planks he slipped and fell to the floor; that as a result of said accident and injury the plaintiff immediately became temporarily totally disabled and is still temporaily (sic) totally disabled and will continue to be temporarily totally disabled for an indefinite (sic) future period; that medical evidence indicates an operation to plaintiff's back is required to correct the painful condition existing in plaintiff's back."

The award further found, by inference at least, that plaintiff at that time had a temporary total disability, that if an operation were performed it decreed that he should receive an award based on a temporary total disability "until the plaintiff has recovered from such surgery and until temporary total disability ceases, but in any event not exceeding the aggregate of 300 weeks * * *."

The award did not undertake, in the event of an operation, to determine either the rate of disability or the compensation payable after "temporary total disability ceases." Of necessity that was a matter that depended on the results of an operation and was clearly left open for subsequent determination. This is made clear by the fact that the degree of disability and the amount of compensation was determined if no operation were had. An operation was had. No question is raised as to whether it was in compliance with the decree.

The question, then, is: Has his temporary total disability ceased and what is the extent of his disability following August 15, 1956?

This brings us to plaintiff's contention that the evidence shows that he is totally and permanently disabled from the compensable injury.

Plaintiff was an unmarried man, 50 years of age at the time of the accident, short of stature and obese. He had a seventh grade education. He had done farming in his younger years. For several years he had been

employed by defendant and performed heavy common labor. A few years before the accident here involved he had suffered a fall. This resulted in an operation removing the coccyx. It appears that recovery from that operation was satisfactory and that no condition resulted that hampered his ability to do hard common labor.

At the time of the accident plaintiff was working on an assembly line of a large oil tank where timbers were soaked in oil. The wooden planks were described as "8 by 12, 2 by 12, 4 by 12" and often were 40 feet in length. These planks came out of the oil vat onto a platform. Plaintiff and another employee, each at an end of a plank, picked them up and put them in piles. Plaintiff slipped and fell, and immediately suffered considerable pain.

On the following day he reported the accident to the defendant and was sent to a doctor. He was examined, X-rayed, and medicine was given. It stands undisputed in the record that the doctor told plaintiff he could do nothing more for him and that the defendant told him it would do no more.

Plaintiff then sought out and employed his own medical and surgical care. On February 3, 1956, he underwent surgery. A laminectomy of the fifth lumbar neural arch and a bilateral foramenotomy at the fifth lumbar interspace were carried out. At the time of the operation it was recognized that plaintiff had a spondylolisthesis Grade II with slipping of the fifth lumbar vertebral body forward on the first sacral segment. Plaintiff was advised to have a total laminectomy at the fifth lumbar neural arch with foramenotomy to decompress the nerve roots in an effort to relieve the pain radiating into the lower extremities. For medical reasons a spinal fusion could not be carried out at that time.

Following that operation plaintiff was unable to resume work of any kind and remained under medical care.

· Such was plaintiff's condition when the award of August 15, 1956, was rendered making a finding of temporary total disability and giving the plaintiff an option to undergo further surgery. Plaintiff elected to receive additional surgery. On September 21, 1956, a spinal fusion from the fourth lumbar neural arch to the first sacral neural arch was performed. It was a "satisfactory procedure" surgically, but plaintiff's inability to work continued.

Following an examination by specialists on February 19, 1957, they questioned whether a fusion of the lumbosacral joint was effected, and reported lumbosacral strain with nerve root pressure and a "suspected pseudoarthrosis of lumbosacral fusion."

· In March 1957, specialists reported (based on X-rays) that "Fusion not apparently complete between L4 and L5." That appears to have been the situation when the modification award of March 22, 1957, was made.

Plaintiff filed his petition on appeal in the district court on April 1, 1957. The matter was not brought to trial until March 17, 1958. In the intervening time plaintiff had been seeking further medical help.

In July 1957, plaintiff was examined by specialists of the Mayo Clinic. They felt that the patient "presented signs of root irritation," and found "evidence of a space-taking lesion in the canal at L-2 space." Surgery was recommended for this "at which time re-fusion of the spine should be done because of evidence of motion in all the lumbar segments."

On December 13, 1957, physicians in Omaha found a continuing lumbosacral region strain "with lumbar five and sacral one nerve pressure"; "a suspected pseudoarthrosis of lumbosacral fusion"; and "a suspicious mild spondylolisthesis" which "possibly * * * antedates his original injury" but which "may be aggravated by injury."

On December 17, 1957, plaintiff was examined by a specialist for the defendant. He found evidence of "a

region of pseudo-arthrosis" and definite motion of both the 4-5 and 5 sacral levels. He did not find evidence of a "true spondylolisthesis" although "degenerative osteoarthritic changes * * * sometimes gives rise to instability at the lumbosacral level, and susceptibility to strain." He further found that the removal of the posterior arch had no influence on his complaint of instability of his back. "Subsequent fusion has completely disintegrated, so that there is movement both the 4-5 level and the lumbosacral level." He found that no doubt this was a "source of considerable discomfort with any attempted heavy work." He recommended "a complete arthrodesis of this segment if possible."

Such was the evidence upon which the trial court found that the period of temporary total disability ended March 20, 1957; that he had at the time of the decree a 50 percent permanent partial disability to the body as a whole; and ordered compensation based thereon beginning March 20, 1957, and thereafter for a period of 239 weeks.

The opinions of the medical witnesses generally agree that plaintiff has a permanent disability. One of plaintiff's witnesses found "considerable disability for labor purposes" and estimated the disability at 50 percent permanent partial disability "of the body as a whole." This language is taken from a report made on December 16, 1957. However, in a report made May 21, 1957, he estimated "a 50% partial permanent disability on the orthopedic phases complicated by demonstrable neurological symptoms."

Defendant's expert witness stated in a written report of December 18, 1957, that the plaintiff was "disabled from any heavy work" and "insofar as moderately heavy work is concerned" he estimated the disability at 30 percent to 35 percent. He further stated that in the event of successful subsequent operation procedures the disability "should be reduced to about 20%." He confirmed this on direct examination as a witness. On

cross-examination he related this estimate to the condition that further surgery for a fusion would result in "solid stabilization."

In Miller v. Peterson, 165 Neb. 344, 85 N. W. 2d 700, we restated the established rule that "a workman who is unable to perform or to obtain any substantial amount of labor, solely because of the accident and resulting injury, either in his particular line of work or in any other for which he is fitted, is totally disabled within the meaning of the workmen's compensation law."

In Miller v. Peterson, *supra,* we had occasion to examine a contention that a court should hesitate to refuse to accept the findings of the medical experts as to the extent of the disability. We held that: "There seems to be an assumption that the ratio of functional loss, or loss from the medical viewpoint, is the same as loss of earning capacity or wage loss. If this were so it would be quite immaterial in what occupation an injured workman was engaged and to what extent he was unable to perform it or similar work because of his injury. Disability under subdivisions (1) and (2) of section 48-121, R. S. Supp., 1953, refers to loss of earning capacity and not to functional or medical loss alone." By quotation from Castle v. City of Stillwater, 235 Minn. 502, 51 N. W. 2d 370, we approved this language: "Thus, in defining total disability, losses in bodily function are not important in themselves, but are only important insofar as they relate to ability to earn an income."

What, then, is the evidence as to plaintiff's ability to perform labor and to earn an income in his particular line of work or in any other for which he is fitted?

The plaintiff, so far as adult occupation is concerned, has always engaged in common labor requiring the use of strong physical effort. He was engaged in that kind of labor for defendant. It does not appear that by education, training, or ability he is able to do anything else. Plaintiff's physician, a general practitioner, testified that "he is unable to perform what is usually termed com-

mon labor." Defendant's expert witness, in his written report of December 18, 1957, stated that plaintiff "is disabled from any heavy work." He made an estimate as to "moderately heavy work" and added "he could carry out duties of a sedentary or light nature, probably utilizing a brace support." He testified on cross-examination that: "I don't think a man like that should do 100 pound lifting." On redirect examination he testified that plaintiff could do lifting of "25, 30 pounds" and such work as farm work, welding, custodial work, "and things of that kind."

Based on the reasoning and conclusion of that case we hold that plaintiff has a permanent total disability, following temporary total disability; that he is entitled to compensation based thereon; and that the trial court erred in not so finding and decreeing. See, also, Haler v. Gering Bean Co., 163 Neb. 748, 81 N. W. 2d 152. In Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262, in the course of the opinion we said: "The plaintiff in the case at bar is an unskilled, or common, laborer. It has been shown that he can work, if at all, at the lightest kind of common labor, such as sitting down, with no heavy lifting. He is, therefore, what is called an 'odd lot' man, the nondescript in the labor market, with which industry has little patience, and rarely hires. Work, if he finds any that he can do, is casual and intermittent. He is utterly unable to do the work he did before this accident. Under these facts, we think we are justified in finding that in his present handicapped condition he is entitled to an award for total disability under the Nebraska Compensation Act."

This brings us to the contention that the trial court erred in not allowing certain medical expenses.

In the original award of August 15, 1956, it was provided that if the plaintiff elected to have further surgery that the reasonable costs thereof should be paid by the defendant. A like provision was in the modification award of March 22, 1957.

Plaintiff offered, and there was received in evidence, exhibits showing bills of doctors and institutions incurred subsequent to the second operation. The objection was that they were for charges for which the defendant was not responsible. The trial court allowed certain of the bills and disallowed others.

Defendant here argues that certain of the bills, which the trial court allowed, were not properly chargeable to it. Defendant does not cross-appeal. It asks here for affirmance of the judgment of the trial court. Under these circumstances we apply the rule that: "The right of an appellee in an action to have reviewed a portion of a judgment or decree against him depends upon whether or not he has perfected a cross-appeal and has assigned error in relation thereto agreeable to the provisions of statute and the rules of this court." Bastian v. Weber, 150 Neb. 709, 35 N. W. 2d 791.

The bill in dispute is that of the Mayo Clinic, as follows:

| | |
|---|---|
| "Laboratory tests | $ 44.00 |
| X-rays: chest, shoulder, cervical spine 2 lumbar spine, thoracic spine | 94.00 |
| Eye ophthalmoscopy | 10.00 |
| Neurology examination | 25.00 |
| Psychiatric examination | 20.00 |
| General examination and consultations | 60.00 |
| TOTAL | $253.00" |

The trial court disallowed the item for laboratory tests, $44; allowed the bill for 4 X-rays of spine, $62.64, and disallowed the balance of $31.36; disallowed the eye ophthalmoscopy, $10; disallowed the psychriatric examination, $20; and disallowed two-thirds of the general examination and consultation examination, $40. The total of the disallowed items was $145.36.

No showing appears here as to the reason for the disallowance of these items in whole or in part. Defendant argues that there was nothing to show that they were necessary in connection with defendant's

treatment. The question of a third surgical operation was pending when the Mayo examination was made. It is obvious that the examination was made to eliminate as well as to determine causes of plaintiff's continued disability.

It may be pointed out that Dr. Gogela examined and reported on "cranial nerves"; eyes; "motor testing" for muscular weakness over the body; "sensory testing"; tests of plaintiff's arms and legs; and an "ophthalmoscopic examination." Dr. Webster, defendant's specialist, examined and reported on a general physical examination in which he excluded certain conditions as causative of plaintiff's disability.

We do not cite these other examinations on any theory of estoppel of the defendant, but rather to show that the physicians involved saw fit to examine to eliminate possible causes in order that they might arrive at an opinion as to causes. Plaintiff testified that he spent $55 for the trip to the Mayo Clinic. This expense was not allowed.

In Newberry v. Youngs, 163 Neb. 397, 80 N. W. 2d 165, we stated this rule: "Section 48-120, R. R. S. 1943, making the employer liable for reasonable medical and hospital services, includes the cost of travel incident to and reasonably necessary for obtaining such services."

In Crable v. Great Western Sugar Co., 166 Neb. 795, 90 N. W. 2d 805, we restated this rule: " 'Where the evidence shows that certain hospital and nurse expenses have been incurred by the injured employee, a prima facie case is made out, and, in the absence of any showing that the expenses so incurred were unreasonable, such proof will be held to be sufficient. * * * Lastly, it is urged that the evidence does not support the judgment, particularly with reference to the allowance of the hospital and nurse expenses. With respect to these items, the plaintiff's evidence does not go beyond the point that they were incurred by him, and defendant does not show that they were unreasonable or unjust

charges. Considering the somewhat informal manner in which cases of this character are tried, we are inclined to hold that the proof offered was sufficient to make out a prima facie case, and, in the absence of any attempt to show that the expenses so incurred were unreasonable or exorbitant, it will be held to be sufficient.' "

The holding must necessarily be that the Mayo Clinic bill should have been allowed in its entirety.

The travel expenses of $55 also should have been allowed under the reasoning in the Crable case that: "We think that under the circumstances presented here, evidence as to cost incurred at defendants' request and received without objection, together with a lack of any effort on the part of defendants to show in any manner that it was not the reasonable cost, was sufficient prima facie proof that it was reasonable."

Plaintiff further assigns as error the failure to allow an attorney's fee. He relies on the provision of section 48-125, R. R. S. 1943, that: "Whenever the employer refuses payment, or when the employer neglects to pay compensation for thirty days after injury, and proceedings are held before the compensation court, a reasonable attorney's fee shall be allowed the employee by the court."

We held in Werner v. Nebraska Power Co., 149 Neb. 408, 31 N. W. 2d 315, that the language above applied to the allowance of an attorney's fee in the compensation court. The record shows that the doctor, to whom defendant sent the plaintiff immediately after the injury, examined him, took X-rays, gave plaintiff some pills, and dismissed him. Plaintiff advised the defendant of that situation and defendant told him: "The company is through with you," and that they would not send him to any more doctors. Medically, thereafter, plaintiff was compelled to look to his own resources.

It appears, also, that defendant paid plaintiff compensation at the rate of $30 per week for some time.

On June 23, 1956, defendant wrote the plaintiff: "We feel we have paid you ample Compensation for your back injury, and are stopping the payments." Thereafter plaintiff filed his petition in the compensation court. This evidence would be ample to sustain a finding by the compensation court that defendant had "refused payment" of compensation, and to have sustained an award of attorney's fee in the compensation court. However, it does not appear that plaintiff sought such an allowance there, at or before the time of the award of August 15, 1956. Such an issue is not mentioned so far as this record discloses. It does appear that plaintiff in his petition on appeal alleged error in the modification award "for failure to allow plaintiff's attorney fees." He prayed for an additional award of attorneys' fees. The allowance of attorney's fee for the reason here given was within the power of the compensation court at the time the first award was made. It was not done. The application now comes too late under the rule that: "A petition to modify such an award cannot be used for the purpose of correcting judicial error, if any, in the original proceeding." Ludwickson v. Central States Electric Co., *supra*.

Accordingly the trial court did not err in not allowing the attorney's fee which plaintiff sought there.

The judgment of the trial court is reversed and the cause remanded with directions to render an award in accord with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.